## NATIONAL BANK OF COMMERCE OF NORFOLK v. LAMBORN et al.

(Circuit Court of Appeals, Fourth Circuit. October 21, 1924.)

No. 2231.

1. Sales ⏦177 — Where contract required "shipment" of sugar to be made to Philadelphia, buyer was not required to accept shipment made to New York and diverted to Philadelphia.

Where contract for sale of sugar required "shipment to be made to * * * from Java by steamer or steamers to Philadelphia," buyers were not required to accept sugar which, though it left Java within time prescribed for shipment, was at first consigned to New York, and was diverted to Philadelphia only when vessel bound for Philadelphia was disabled; "shipment," as so used, having a particular meaning.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Shipment.]

2. Sales ⏦54—Court must give effect to every term in mercantile contracts.

In construing mercantile contracts, courts must give effect to every term, and are not at liberty to speculate whether the parties did or did not attach importance thereto.

In Error to the District Court of the United States for the Eastern District of Virginia, at Norfolk; D. Lawrence Groner, Judge.

Action by Arthur H. Lamborn and others, doing business as Lamborn & Co., against the National Bank of Commerce of Norfolk. Judgment for plaintiff, and defendant brings error. Reversed and remanded.

Tazewell Taylor, of Norfolk, Va., for plaintiff in error.

H. G. Connor, Jr., of Wilson, N. C., and Edward R. Baird, Jr., of Norfolk, Va. (Baird, White & Lanning, of Norfolk, Va., and Van Doren, Conklin & McNevin, Louis O. Van Doren, and Alfred C. B. McNevin, all of New York City, on the brief), for defendants in error.

Before WOODS, WADDILL, and ROSE, Circuit Judges.

ROSE, Circuit Judge. This is another sugar case. Those concerned in the transactions out of which it arose will be referred to as the seller, the buyer, and the bank. Only the first and last of these are parties to this litigation. The seller was plaintiff below and is defendant in error here. It is a partnership trading as Lamborn & Co., and is composed of nearly a dozen persons, every one of whom is a citizen of some other state than Virginia.

On the 23d of April, 1920, it entered into a written contract with the buyer, Southgate & Co., of Norfolk, Va., by the terms of which it sold the latter 1,000 bags of Java white sugar, of about 224 pounds to the bag, 10 per cent. more or less at 22 cents per pound, duty paid, f. o. b. cars Philadelphia, landed weights. The sugar was to be shipped during August/September, at the option of seller, from Java, by steamer or steamers to Philadelphia. The names of such steamer or steamers were to be declared later. Should the steamer or steamers declare against the contract fail to arrive at the port of destination for any cause, seller was to be relieved of responsibility under the contract. It was further provided that in case there was damage to the sugars in transit to Philadelphia preventing seller from making full delivery, seller was to deliver to each purchaser of sugar aboard that steamer a proportionate part of the sound packages. Payment was to be made net cash on presentation of sight draft with invoice and bill of lading attached. Buyer was to open within five days confirmed irrevocable letter of credit in favor of seller for the full invoice value of the 1,000 bags. If unforeseen circumstances, such as embargoes, government supervision or interference, accidents, fires, strikes, car shortages, riots, stress of weather, etc., prevented shipment within the time specified, the buyer had the option of canceling the portion of the contract affected by the delay or taking the sugar so affected for later shipment without claiming damages. The buyer's decision was to be given immediately upon advice of the seller that delay had occurred. In the event of such cancellation by the buyer, the seller was to be under no further obligation under the contract.

A letter of credit was promptly opened, but because it was not worded in some respects as the buyer and seller desired, it was withdrawn and another dated May 11, 1920, was issued in its place by the bank, the National Bank of Commerce of Norfolk, Va. It is upon this latter document that the seller is here seeking to recover from the bank. It was for $53,123.84, a sum arrived at by figuring what the buyer would owe the seller if the amount of sugar exceeded by the permissible 10 per cent. the 1,000 bags at 224 pounds each. In that event there would be delivered 246,400 pounds of sugar which at 22 cents per pound would foot up $54,208, from which by the terms of the contract 2 per cent., or $1,084.16, would be deducted leaving the amount for which letter of credit was issued. Apparently, when the letter was received by the seller, it did not notice that it contained the provision that before payment could be demanded by the seller, the latter must present to the bank, or rather to the Bankers' Trust Company of New York, through which the credit was made payable, a sight draft with invoice and copy of ocean bill of lading covering shipment, Java to Philadelphia, and order notify bill of lading; the latter bill, of course, being the one to be issued by the railway carrier to whom in accordance with the contract the sugar was to be delivered f. o. b. cars at Philadelphia. In the contract the seller had bargained to attach to the draft only the invoice and bill of lading, by which it understood the railroad bill. When the seller realized that the letter of credit required it to present with its draft a copy of the ocean bill of lading as well, it took up the matter with the other parties, writing on the 10th of June that the sugar was being shipped from Java in cargoes of thousands of tons, and as each cargo would include the sugars intended for a number of different purchasers, it would be impracticable to furnish to each of these a copy of the ocean bill of lading. Some correspondence ensued and finally on the 15th of July, the bank notified the seller that it had been authorized by the buyer to eliminate the copy of the ocean bill of lading covering shipment from Java to Philadelphia. It added that all other terms and conditions in the credit were to remain as theretofore. One of these other terms which consequently was unchanged was that which was headed "Shipment" and which reads as follows: "Shipment to be made during August/September, 1920, at option of the sellers from Java by steamer or

steamers to Philadelphia." When in December the sugars arrived in Philadelphia and were put upon the cars, and the seller's draft was presented, the bank refused payment. It says that it was entitled to do so because the sugars were not shipped from Java to Philadelphia.

There is no dispute as to facts. The controversy is as to the legal effect of that which admittedly took place. On the 30th of August, the seller had notified the buyer that the sugars were going forward by the Chifuku Maru or the Washington Maru, or substitutes. Nearly a month later, and within one day of the expiration of the time during which the seller was bound to ship the sugar from Java, it wrote the buyer that the Chifuku Maru was carrying the latter's sugars and was due to arrive the latter part of October. On November 10th, it again wrote the buyer that the sugars were to arrive in Philadelphia the last half of November on the steamship Chifuku Maru. There was shipped in that steamer from Java to Philadelphia, a full cargo of sugar including much more than the amount which the seller had contracted to deliver to the buyer. Unfortunately the steamship developed engine trouble of so serious a character that it became evident that it might be forced to remain at Port Said for an indefinite period. The seller had on board the steamship West Cheswald sugars which before the end of September had been shipped on her from Java to New York. On the 11th of December that vessel was within about three days sail of her destination. The price of sugar had by that time fallen to a fraction of that which the buyer had agreed to pay, and doubtless the seller was anxious that there should be no departure on its part from the terms of the contract, and it might be that the Chifuku Maru would never get to Philadelphia.

It occurred to the seller that the West Cheswald might be diverted from New York to Philadelphia, and accordingly on the 11th the seller took up the matter with the agents of that ship, and asked whether such agents would consider the sending of her to Philadelphia instead of to New York. The reply was it would all depend on how the seller's sugars were stored. A radiogram was thereupon sent to the master of the ship, directing him to radio immediately amount general cargo and sugar aboard, how stored, and if Lamborn's sugar could be discharged without moving other cargo. He replied that the Lamborn's sug-

ar would be available without moving other cargo and must be discharged first, and added the ship was due to arrive about December 14th. At the time the ship was somewhere in the neighborhood of the Bermudas. The Shipping Board which was the owner of the West Cheswald was communicated with and asked if it would consider sending that ship to Philadelphia instead of New York. The Board authorized the diversion of the steamer to Philadelphia at an additional freight charge of $1 per ton and on the afternoon of December 13, the seller accepted the Shipping Board's terms and agreed to pay $3,572 the extra freight on its sugars. Thereupon, on the 13th, the West Cheswald by radio was directed to proceed to Philadelphia. The ship reached the Delaware breakwater by midnight of the 14th and apparently arrived at Philadelphia a few hours later.

The courts, state and federal, in at least four other cases, have had before them tenders, by this seller under similar contracts to that here involved, of sugars brought by the West Cheswald to Philadelphia. Wilbur v. Lamborn, 276 Pa. 479, 120 A. 478, 27 A. L. R. 160; Matthew Smith Tea, Coffee & Grocery Co. v. Lamborn (D. C.) 276 F. 325; Smith v. Lamborn (Sup.) 200 N. Y. S. 292; Williams Ice Cream Co. v. Chase National Bank, 120 Misc. Rep. 301, 199 N. Y. S. 314, reversed by the Appellate Division of the Supreme Court of New York for the First Department in June of this year, in an opinion which we have seen (210 App. Div. 179, 205 N. Y. S. 446). In every one of these, as well as below in the instant case, it was held the buyers were bound to receive and pay for the sugars. In most of them the question principally discussed was whether the seller had the right under the contract to declare the West Cheswald as and when it did. The buyers contended that letters of August 30, September 29, and November 10 from the seller, identical in phraseology with those of the same dates above referred to, amounted to a final declaration of the Chifuku Maru, which could not be subsequently changed without the consent of both buyer and seller. That particular defense is not open to the buyer in the instant case because its letter of credit contains no requirement for a declaration. Apparently the letters of credit procured by the buyers in the other litigated cases were equally silent on that point, a circumstance which doubtless explains why in

them the controversy took the form either of an application by a buyer for an injunction to prevent payment on the letter of credit or of a. suit by the buyer against the seller to recover what the latter had received upon such letter. The right of the seller to declare the West Cheswald when and as it did was sustained by every one of the courts which felt called to pass upon that question. It is not before us, and we are not called upon to say anything about it.

[1] In two of the cases, namely, Smith v. Lamborn, supra, and Wilbur v. Lamborn, supra, as well as by the learned judge below in the one now at bar, something was said as to the contention upon which we are required to pass, namely, whether the "shipment" of sugars on the West Cheswald was made "from Java by steamer or steamers to Philadelphia." In the jurisdictions other than this, each of the courts apparently felt that the answer it gave was so obviously correct as to require the support neither of discussion nor of authority.

In Williams Ice Cream Co., Inc., v. Chase National Bank, the learned judge in the court of the first instance who heard the case thought it sufficient to say: The "plaintiff urges that the sugar was not a shipment from Java to Philadelphia, but to New York; * * * in other .words, that a shipment is not the course that a designated vessel takes, but a course intended that it should take. This refinement to me seems more one of sophistry than reason and carries with it failure of conviction." In the Appellate Division this. particular point is not noticed at 'all. The Supreme Court of Pennsylvania in Wilbur v. Lamborn was almost as brief: "Some point is made * * * of the fact that the West Cheswald was originally bound for New York and diverted to Philadelphia. We think this diversion. was of no consequence, under the contract. Plaintiff was concerned only with the delivery of the merchandise, that there should be no delay in its arrival. It was delivered as the result of a continuous voyage from Java to Philadelphia. These contracts do not say that the sugar shall be shipped by continuous voyage from place of shipment to destination, what they provide is that the shipment. shall be 'from Java by steamer or steamers to Philadelphia,' even if they did so provide, we might not be prepared to hold—under the facts here appearing, that the voyage was in reality a continuous one, although the first

destination of the ship was New York—that this latter circumstance would avoid the contract." From the report of the case it appears that Filley v. Pope, 115 U. S. 213, 6 S. Ct. 19, 29 L. Ed. 372, was cited by counsel but is not referred to by the court.

In the instant case the learned judge below said. "The letter of credit is complied with it seems to me by the shipment within a reasonable time, of course, from Java and the arrival within a reasonable time at Philadelphia. I cannot imagine that the contract contemplates or requires that there must have been all the time from the inception of the voyage, an intention and purpose to send the vessel to Philadelphia. If the intention occurred and was consummated by the act itself any time after the voyage commenced, it seems to me it would be in compliance with the contract. It would be all that reason and fair play and justice would require. I was very much interested in the Supreme Court case, and of course, if it is parallel with this, I shall have to follow it and be bound by it; but I do see a difference in a shipment from Leith and a shipment from Glasgow. The delivery of this shipment to New York would have been unquestionably a noncompliance with the contract which would have avoided this letter of credit; so the shipment of this sugar from some other point than Java would have been a noncompliance with the contract, notwithstanding the precise quantity and the precise quality of sugar was furnished, but to say that although the exact terms of the contract were complied with, because it was not the purpose, or not the intention, or not the arrangement that what was done should be done at the beginning vitiated this guaranty, it seems to me is going farther than I think I have the right to go."

The Supreme Court case referred to in the above quotation was, of course, Filley v. Pope, supra. In it a Scotch iron master, by contract with a resident of St. Louis, sold the latter 500 tons of pig iron, and undertook that shipment should be from Glasgow as soon as possible. It appeared that the seller's iron works were about equally distant from Glasgow, on the west coast of Scotland, and from Leith, on the east, and that in the ordinary course of trade shipments were made indifferently from either. At the time of the sale, no vessel from Glasgow was immediately available, and the only ship by which prompt transportation was possible was about to leave

Leith. The seller accordingly put the iron upon her, and it arrived at its destination earlier than it could possibly have done had it gone from Glasgow. The trial court held that the provision "that the iron was to be shipped from Glasgow was not a material provision," "that the purpose of the contract was the sale" of a certain quantity of iron to be delivered at a certain place and that the fact "that it was shipped from Leith, instead of Glasgow, was not material to the rights of the parties."

That point of view is in substance the same as that which has commended itself to the courts which have heretofore passed upon the precise question now before us. They have thought that, if within a reasonable time the sugar was carried to Philadelphia by a vessel which in fact sailed from Java to Philadelphia, it made no difference that, when the shipment was made in Java, it was upon a ship which was bound on a voyage, not to Philadelphia, but on one to New York. In Filley v. Pope, however, the Supreme Court held that the contract was a mercantile one, as that now at bar is, and that in such a contract "a statement descriptive of the subject-matter, or of some material incident, such as the time or place of shipment, is ordinarily to be regarded as a warranty, or condition precedent, upon the failure or nonperformance of which the party aggrieved may repudiate the whole contract."

Referring to the case of Norrington v. Wright, 115 U. S. 188, 6 S. Ct. 12, 29 L. Ed. 366, decided on the same day, Mr. Justice Gray said that "the provision * * * in that case related to the time; in this, it relates to the place of shipment," as in the case now at our bar it related to the place to which the shipment was to be made. The Supreme Court said it was not "merely 500 tons of iron of a certain quality" that was sold, nor was "it such iron to be shipped as soon as possible from any Scottish port or ports, but it 'was' iron of that quality to be shipped from the particular port of Glasgow as soon as possible." "The court has neither the means, nor the right to determine why the parties in their contract specified 'shipment from Glasgow,' instead of using the more general phrase 'shipment from Scotland,' or merely 'shipment,' without naming any place; but it is bound to give effect to the terms which the parties have chosen for themselves. The term 'shipment from Glasgow' defines an act to be done by the sellers at the outset, and a condition precedent to any liability of the buyer. The sellers do not undertake to obtain shipment, nor does the buyer agree to accept iron shipped, at any other port. The buyer takes the risk of delay in getting shipment from ·Glasgow, or of delay or disaster in prosecuting the voyage from Glasgow to New Orleans; but he does not take the risk of delay or of sea perils which may occur in the course of the different voyage from Leith to the same destination. One or two illustrations may help to make this clear. If the sellers had shipped the iron by the first opportunity from Glasgow, the buyer could not have refused to accept it, even if it could have been shipped sooner from Leith. Again, the buyer would have an insurable interest in the iron during the voyage, by reason of the title which would accrue to him under the contract on arrival and delivery, and of the profits that he might make in case of a rise in the market, * * * but a policy of insurance upon the iron for a voyage from Glasgow would not cover a voyage from Leith;" just as in this case, although the title to the sugar was not to pass until its delivery f. o. b. cars Philadelphia, the buyer had an insurable interest in it, and, had the sugar market continued to advance, he might well have desired to insure the gain he would make from his contract, and insurance effected on sugar from Java to Philadelphia would not have covered sugar on a ship bound for New York. Murray v. Columbian Insurance Co., 4 Johns. (N. Y.) 443.

In the case before us the parties had definitely bargained for a "shipment" "from Java to Philadelphia," as in Filley v. Pope they did for a shipment "from Glasgow." Some of the courts which have upheld the contention of the seller in cases arising out of sugars tendered from the West Cheswald have done so because in their view whether the shipment was to Philadelphia depended on the voyage the ship actually made, and not upon the one she started out to make and for which she issued her bills of lading. If they are right, they were of course justified in holding that Filley v. Pope was not a controlling authority. The bank, however, argues that in mercantile contracts such as this the word "shipment" has a definite meaning. When it is used in connection with the time or place at or the destination to which it is to be made, it has reference to the conditions which existed at and before the sailing of the ship and that therefore the sugar tendered under the letter of credit was a shipment, not "to Philadelphia," but "to New York." If that be so, Filley

v. Pope is necessarily decisive of the controversy.

In Norrington v. Wright, supra, the Supreme Court cited with approval Bowles v. Shand, 2 App. Cases, 455: In that case a contract was made in London, for the sale of 6,000 tons of Madras rice, to be shipped at Madras or coast during the months of March and/or April, 1874, per Rajah of Cochin. The 6,000 tons filled 8,200 bags, of which 7,120 were put on board and bills of lading signed in February, and for the rest, consisting of 1,030 put on board in February and 50 in March, the bill of lading was signed in March. The House of Lords held the seller could not require the buyer to accept the rice, because the meaning of the contract, as apparent upon its face, was that all of the rice must be put on board in March and April or in one of those months. The shipment took place when the rice was put on board the ship, and what was then done determined the time and character of the shipment, precisely as whether the shipment of the sugar in the case at bar was made to New York or Philadelphia was necessarily determined when, the sugar being on board the ship, the bills of lading for it were issued.

In answer to a suggestion similar to one which seems to have had much weight with some of the courts which have considered the contract now in controversy, viz. that it made no difference to the buyer whether the sugar was originally consigned to New York or to Philadelphia, Lord Chancellor Cairns said: "It does not appear to me to be a question for your lordships or for any court to consider whether this is a contract which bears upon the face of it some reason, some explanation why it was made in that form, and why the stipulation is made that the shipment should be during these particular months. It is a mercantile contract, and merchants are not in the habit of placing in their contracts stipulations to which they do not attach some value and importance. If it be admitted that the literal meaning would imply that the whole quantity must be put on board during a specified time, it is no answer to that literal meaning, it is no observation which can dispose of, or get rid of, or displace, that literal meaning to say that it puts an additional burden on the seller without a corresponding benefit to the purchaser; that it is a matter of which the seller and the purchaser are the best judges. Nor is it any reason for saying that it would be a means by which purchasers without any real cause would frequently obtain an excuse for rejecting contracts when prices have dropped. The nonfulfillment of any term of the contract is a means by which a purchaser is able to get rid of the contract when prices have dropped, but that is no reason why a term which is in a contract should not be fulfilled."

In the same case that eminent authority on the law of sale, Lord Blackburn, said: "If the description of the article tendered is different in any respect, it is not the article bargained for, and the other party is not bound to take it. I think in this case what the parties bargained for was rice shipped at Madras, or the coast of Madras. Equally good rice might have been shipped a little to the north or a little to the south of the coast of Madras; probably equally good rice might have been shipped in February as was shipped in April, and I dare say equally good rice might have been put on board another ship as that which was put on board the Rajah of Cochin, but the parties have chosen, for reasons best known to themselves, to say we bargained to take rice shipped in this particular region, at that particular time, on board that particular ship, and before defendants can be compelled to take anything in fulfillment of that contract, it must be shown, not merely that it is equally good, but that it is the same article they have bargained for; otherwise, they are not bound to take it."

The same principle was applied by Lord Chief Justice Russell in Ashmore & Son v. Cox & Co., L. R. 1899 1 Q. B. 436. In that case 250 bales of Manila hemp were sold, shipment to be made from a port or ports in the Philippine Islands by sailor or sailors, direct or indirect to London, between May 1 and July 31. No hemp was shipped by the seller by sailor or sailors, nor during the time limited; but on September 15, it did ship 250 bales of Manila hemp by a steamship which was expected to arive and did arrive in London about the same time as the sailing ship would have arrived, had it sailed July 31. It was held that the date of shipment, and that it was to be made by a sailor or sailors, was binding. In that case it was urged, precisely as it has been at bar, that all the buyer was interested in was that goods of the kind and quality be had bargained for should arrive at the time and place originally contemplated.

Few men have been more deeply learned in mercantile law than Mr. Justice Scrutton. In Landauer v. Craven & Speed Bros., L. R. 1912, 2 K. B. 94, he passed upon a case in which 500 bales of Manila hemp had been

sold for delivery at London. The terms of the contract gave much liberty to the seller, and by so doing indicated that the buyer was chiefly interested in the ultimate delivery of the hemp to him. It was agreed the shipment might be made from any recognized shipping port or ports in the Philippine Islands, or from Hong Kong or Singapore, at any time within a three months interval between October 1 and December 31. The shipment might be direct or indirect. It was in fact made from Manila in due season, but on a bill of lading which called for delivery at Hong Kong. At the last-named port, subsequently to December 31, the hemp was put upon another ship, and there was issued for it a new bill of lading from Hong Kong to London. Mr. Justice Scrutton held that the seller was bound within the time named in the contract to ship at the port of shipment goods of the description contained in the contract, and on shipment to procure a contract of affreightment under which the goods would be delivered at the destination contemplated by the contract. He said, if when the seller ships goods sold c. i. f. London, he has no contract for carriage to London, but only an intention to make one, he cannot forward this and tender an intention to the buyer. He further said that a seller c. i. f. must ship his goods under a contract for conveyance to the port of destination which can be transferred, and not under a contract for part of the way and to take another which cannot be transferred. Now it is true, as it is pointed out by the learned counsel for the seller, that the contract here is not a c. i. f. contract, but it is one under which the buyer had an insurable interest, and is therefore one which, so far as this question is concerned, is governed by the same principle. Moreover, at all events, Landauer v. Craven & Speed is one of the many cases which hold that the character of the shipment is fixed at the time it is made, a principle which has received new and recent affirmation by the House of Lords in Hansson v. Hamel & Horley, L. R. 1922, 2 App. Cases 36.

[2] We in the past have had more than one occasion to hold that in mercantile contracts the courts must give effect to every term in the bargain the parties have chosen to make, and are not at liberty to speculate whether they did or did not attach importance to something they wrote. As, for example, in The Manhattan, 284 F. 310, we accepted as settled law that a purchaser of grain to be shipped by one ship could not be required to take it if it came in another, and that we could not inquire whether every possible purpose of the buyer would not be as well served by that which was brought in the substitute. From much which was said by the tribunals which have heretofore passed upon the obligation of buyers to accept sugar from the West Cheswald, it would seem that it is at least possible that their conclusions were influenced not a little by their natural desire to prevent purchasers on a rapidly falling market from escaping from a bad bargain, by taking advantage of a variation from the terms for which they in fact cared nothing. Such considerations have much less weight in construing and enforcing the agreements of business men than the courts may properly give to them when they are called upon to deal with contracts of a less strictly mercantile character. In this respect we can add nothing to what has been so forcibly said in the quotations made from Mr. Justice Gray in this country and from Lords Cairns and Blackburn in England. Our examination of the cases which in this country and across the water have put a definite interpretation on the meaning of the word "shipment," as used in contracts of the character of that with which we are here concerned, has convinced us that the instant case is not distinguishable from them, and is governed by what the Supreme Court there said.

It follows that the learned court below erred in rejecting the prayer of the defendant for a directed verdict in its favor, and in consequence the judgment below must be reversed, and the case remanded for a new trial.

Reversed.