**LeROY DYAL CO., Inc., v. ALLEN.**

**No. 5578.**

Circuit Court of Appeals, Fourth Circuit.

April 15, 1947.

Thomas H. Middleton, of Charleston, S. C. (Hill, Rivkins & Middleton, of New York City, on the brief), for appellant.

Huger Sinkler, of Charleston, S. C., for appellee.

Before PARKER, SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

By this appeal the LeRoy Dyal Company, Inc., seeks approval of a reparation order issued by the Secretary of Agriculture on March 25, 1946, under the Perishable Agricultural Commodities Act, 7 U.S.C.A. § 499a et seq., whereby Charles R. Allen, the appellee, was directed to pay to Dyal the sum of $5988.02 with interest, for damages caused by the breach of a contract for the sale of potatoes. The Secretary's order was reversed by the judgment of the District Court in proceedings taken under Section 7(c) of the statute, 7 U.S.C.A. § 499g (c). This section provides that such a suit in the District Court shall be a trial de novo and shall proceed in all respects as a civil suit for damages except that the findings of fact and orders of the Secretary shall be prima facie evidence of the facts therein

stated. The case was submitted to the District Judge upon the proceedings, and testimony taken in the trial before the Secretary.

There is no dispute as to the facts. As shown by a memorandum issued on February 19, 1944, by Dyal, the broker who arranged the sale, twenty cars of potatoes were sold by A. P. Cohen Company of Fort Fairfield, Maine, to Charles R. Allen of Charleston, South Carolina, "at $2.45 cwt. fob Maine shipping point, fob acceptance final with Federal Inspection certificates to be furnished on each car as shipped." The cars were to be shipped with heater service paid for by Allen, and Cohen was to draft on Allen at Charleston for each car as shipped, attaching invoices and federal inspection certificates to each draft. The Dyal Company guaranteed the payment of the drafts. Shipping directions for the immediate shipment of two cars were given, and these cars were shipped and paid for. It was agreed that if Allen did not furnish shipping directions on the remaining cars between February 21 and February 26, Cohen was to ship them to Allen at Charleston on February 28 and 29. Allen furnished no shipping directions for the remaining eighteen cars. Eight cars were shipped between February 29 and March 2, and these were accepted and paid for.

The controversy relates to the remaining ten cars which Allen refused to accept and Dyal sold to minimize the loss. He was obliged to sell them below the contract price since the market had fallen. He paid the drafts in full and filed claim under the statute with the Secretary of Agriculture for the difference, which is the basis of this suit. Neither the amount of the loss nor the right of Dyal to sue for it in place and stead of Cohen is disputed.

The potatoes loaded in the ten cars in suit and subsequently sold by Dyal were of the kind, quality and grade called for in the contract. But even before the goods were shipped, Allen repented of the contract, asked to be relieved therefrom, and employed a lawyer to represent him. He was moved to take this action because the market for potatoes had fallen. He based his right to reject the shipments on the ground that Cohen had broken the contract in two

154

respects which related to the dates of the inspection certificates accompanying the drafts and the dates when the ten cars were shipped. He contended that by these breaches of the contract he was released from all obligation to accept the shipments. He offered no evidence, however, to show that he was injured in any way by Cohen's departures from the precise terms of the contract. The District Judge pointed out that no particular damage had been shown and no attempt had been made to do so. He thought it was a hard case but since the market had changed and someone had to lose, he concluded that the loss should be borne by the party who had failed to comply strictly with the contract terms.

The nature and extent of the so-called breaches are shown by the following particulars in regard to the shipment of the ten cars. The contract called for the shipment of these cars on February 28 and 29, since Allen had given no shipping directions for them. These cars were shipped on February 26 and 27, and on this account Allen rejected them. Four of these cars were rejected for the additional reason that the inspection certificates as to them were dated from one to three days prior to the date of shipment. Four other cars, which were shipped on February 28 or 29, were rejected solely for like variation between the dates of the inspection certificates and the dates of shipment. Allen contends, and the District Judge held, that the requirement of the contract that the inspection certificates be furnished "on each car as shipped" means that the inspection must be made on the day of shipment and that strict performance is important because the buyer needs to be assured of the condition of the goods on the day of shipment when he pays the draft, especially as his right to reject shipment is severely limited by the contract terms defined in the statutory regulations to which we shall later refer.

We are not convinced that this is the proper interpretation of the contract. It is susceptible of the meaning that the certificates should be forwarded as the cars were shipped and that the inspection should be made within a reasonable time prior to shipment so as to show the true condition of the goods when shipped. What a reasonable time would be would naturally vary with the circumstances. In the case of potatoes shipped in winter time in heated cars, it would not seem to be of prime importance that the inspection be contemporaneous with the shipment. In any event, it was of no practical importance in this case since the goods arrived in good condition. For like reasons it was of no practical significance that some of the cars left the shipping point a day or two before the contract dates. Allen was in no way disadvantaged or injured by either fact.

The legal significance of these departures from the strict terms of the contract must be determined by considering the general law of sales and the provisions of the federal statute and the regulations issued thereunder. The buyer contends that we should apply the strict rule that in executory contracts of sale, time is of the essence in an action at law; and since the seller did not conform to the time specified in the contract either as to the inspection or shipment of the goods, the buyer was justified in refusing to accept them. The strict view, that a statement in a contract descriptive of the subject matter or of some material incident, such as the time or place of shipment, is ordinarily to be regarded as a condition precedent upon nonperformance of which the party aggrieved may repudiate the agreement, is taken in such cases as Norrington v. Wright, 115 U.S. 188, 6 S.Ct. 12, 29 L.Ed. 366; Filley v. Pope, 115 U.S. 213, 6 S.Ct. 19, 29 L.Ed. 372; Phillips & Colby Construction Co. v. Seymour, 91 U.S. 646, 23 L.Ed. 341; Cleveland Rolling Mill v. Rhodes, 121 U.S. 255, 7 S.Ct. 882, 30 L.Ed. 920; Oshinsky v. Lorraine Mfg. Co., 2 Cir., 187 F. 120; General Electric Co. v. Chattanooga Coal & I. Corp., 6 Cir., 241 F. 38; Connell Bros. Co. v. H. Diederichsen & Co., 9 Cir., 213 F. 737; National Bank of Commerce v. Lamborn, 4 Cir., 2 F.2d 23, 36 A.L.R. 509; Salmon v. Boykin, 66 Md. 541, 7 A. 701; Arons v. Cummings, 107 Me. 19, 78 A. 98, 31 L.R.A., N.S., 942. However, according to Williston on Sales, Vol. 2, § 453d and Williston on Contracts, Vol. 3, § 847, the rule in

equity is different and the absorption of equitable principles has modified the severity of the rule even without the aid of statute in actions at law. Farris v. Ferguson, 146 Tenn. 498, 242 S.W. 873, 23 A.L.R. 624; P. J. Carlin Const. Co. v. Guerini Stone Co., 1 Cir., 241 F. 545, 551; New Jersey Co. v. Nathaniel Wise Co., 55 Misc. 294, 105 N.Y.S. 231; Colonial Sugars Co. v. Durand, 7 Cir., 286 F. 499; Bonney v. Blaisdell, 105 Me. 121, 73 A. 811; Strother v. Miller, Ky., 124 S.W. 358. Thus in Farris v. Ferguson, 146 Tenn. 498, 504, 242 S.W. 873, 874, it was said:

"* * * it will be noted that the growing tendency has been to modify the harsh and often inequitable rule of the common law, and the courts now determine each case upon its own peculiar facts, the question as to whether time is of the essence of the contract being one of construction controlled by the intention of the parties, and the courts, in the absence of an express stipulation making time as of the essence, are not disposed to so treat it, unless the surrounding circumstances make it apparent that the parties intended that it should be ineffectual unless performed within the time stated."

In New Jersey Co. v. Nathaniel Wise Co., 55 Misc. 294, 105 N.Y.S. 231, 233, it was said:

"The rule that time is to be regarded as of the essence was originally designed to carry out the presumed intention of the parties. When it is clear that the application of this rule would be contrary to the intention of the parties, the reason for the application of the rule no longer exists, and the rule itself is inoperative. The adoption of a reasonable construction, which gives effect to the original intention of the parties, is more in harmony with the spirit and reason of the general rule than is adherence to a narrow and literal interpretation, which does not effectuate such intention."

This amelioration of the strict rule brings the law of sales in closer harmony with the law of contracts generally where it is established that if a contract calls for a number of performances on both sides, and there is no clear intention as to what shall happen if default is made in a prior performance of slight importance, it does not follow that subsequent performance by the other party is excused. The decision depends upon the importance and materiality of the prior default, and the materiality of the failure should be determined by ascertaining whether it would be more just to free the injured person or to require him to perform his promise giving him, in either event, a right of action for any damages he may have suffered. See Williston on Contracts, §§ 829, 841-848; Restatement of Contracts, §§ 269, 274, 275, Comment a, 276, Jacob & Youngs, Inc. v. Geo. Edw. Kent, 230 N.Y. 239, 129 N.E. 889, 23 A.L.R. 1429. The circumstances of the pending case clearly bring it within the ambit of this just and equitable view. The slight variation in the inspection and shipment dates was totally immaterial to the interests of the buyer. The condition of the goods was above criticism when they were placed in the cars, and when they were subsequently received and again inspected in Baltimore where the broker was obliged to take charge of them because of the buyer's rejection. The buyer indeed was not influenced by the fear that either circumstance would cause him loss; his sole concern was to find some legal basis to free him from his contract obligation. It may be added that although the agreement to furnish inspection certificates for the cars as shipped was of material importance to the buyer, it was nevertheless merely collateral to the main object of the contract; and the rule is that in such situation the surrounding circumstances furnish the guide to the court in determining whether the failure to perform it at a fixed time relieves the other contracting party from his contract obligation. Williston on Sales, § 453d; Meier Dental Mfg. Co. v. Smith, 8 Cir., 237 F. 563; Ady v. Jenkins, 133 Md. 36, 104 A. 178.

It is notable, moreover, that the default charged against the shipper is not that the shipment was too late, which is the usual defense when the rule that time is of the essence is invoked, but that the shipment was too early, a circumstance which

in a declining market would serve to help rather than to injure the buyer. The pending case in many respects resembles that before this court in Forsyth Furniture Lines v. Druckman, 4 Cir., 8 F.2d 212, 214, 47 A.L.R. 185, in which it was held that a contract for the sale of furniture to be shipped at the rate of one carload per week was not broken by the shipment of a carload ahead of time, where the buyer sustained only a trifling loss which was capable of precise determination. After reviewing certain cases in which it was held that time was of the essence in a mercantile contract, the court held that the buyer was not excused from accepting the goods by the seller's departure from the literal terms of the contract. Basing its conclusion on the inherent justice of the seller's position, the court said:

"* * * Certainly, no such intentional disregard of the terms of the contract is here established as would justify the court in directing on that ground a verdict for the buyer. All the testimony suggests that the seller, in view of the abundant signs of an approaching collapse in the furniture market, was nervously anxious not to be held in default because the furniture was not shipped as fast as might be required by a literal interpretation of the contract. * * * The consequences of the breach alleged against the seller are separable and independent of the principal provisions and purposes of the contract. They are all trifling in themselves. They are capable of certain and definite ascertainment in money. The buyer is so situated that he has in his own hands the means of absolutely protecting himself against any loss or inconvenience resulting from the alleged departure from the terms of the contract. Under such a combination of circumstances he cannot be permitted to escape from his obligation merely because the other party, in consequence of a misunderstanding, committed what is possibly a trifling breach of one of the terms, when for it complete and accurately determined compensation can be made."

■■ This examination of the principles of law pertinent to the instant case makes it clear that even if the buyer had suffered damages from the seller's failure to observe the precise dates of inspection and shipment, the buyer would have been obliged to accept the goods under his contract f. o. b. acceptance final and seek recovery of his damages from the seller. In the situation which actually prevailed, however, no damages whatsoever occurred. There was indeed not merely substantial performance of all the terms of the agreement but the departures therefrom were so insignificant as to come within the principle de minimis non curat lex. The seller, under the authorities cited, was therefore entitled to recover the full contract price.

■ We do not find that these conclusions should be modified when we come to consider the bearing upon the controversy of the Perishable Agricultural Commodities Act. That statute, as its legislative history shows, was passed primarily to eliminate unfair practices in the marketing of perishable agricultural commodities in interstate commerce in the case of a declining market by making it difficult for unscrupulous persons to take advantage of shippers by wrongful rejection of the goods upon arrival at a point where it is expensive and impracticable for the shipper to enforce his legal rights. (See the report of the Senate Committee on Agriculture and Forestry accompanying Senate Bill 108, 71 Congress, and filed May 3, 1929, Senate Report No. 6, and the debates on the Bill in the House of Representatives, 72 Cong. Rec. Part 8, pages 8537, 8538, 8540, 8544, 8545, 8547.)

To this end the statute defines and prohibits unfair conduct on the part of commission merchants, dealers and brokers and requires them to secure licenses to be issued by the Secretary of Agriculture authorizing them to carry on their business. Such a person found guilty of unfair conduct is declared to be liable in damages to the injured party, and such liability is made enforceable by complaint to the Secretary or by suit in any court of competent jurisdiction; but it is provided that this section shall not in any way alter or abridge the remedies now existing at common law or by statute, and that the provisions of the federal statute are in addition to such remedies. Provision is made for the filing of

complaints with the Secretary, for notice to the accused, hearings before an examiner, determinations by the Secretary of the amount of damages, if any, and the passage of a reparation order directing the offender to pay to the complainant the amount of the damages suffered. There is provision for the enforcement of a reparation order by suit in either a federal or state court; and there is provision for an appeal in the federal court from a reparation order by the party adversely affected. Such suits in the federal court are directed to proceed in all respects like other civil suits for damages except that the findings of fact and orders of the Secretary shall be prima facie evidence of the facts therein stated. The Act also provides for the suspension or revocation of licenses by the Secretary, the keeping of correct accounts by the licensees, the enforcement of penalties by the Attorney General, the investigation of complaints, the inspection of perishable commodities and the issuance of rules and regulations by the Secretary to carry out the terms of the statute.

These provisions were obviously designed to achieve the end in view by affording convenient hearings and permitting determination of complaints, and by subjecting persons in the business of marketing perishable commodities to governmental inspection and control. The general purpose of the Act is described in the departmental interpretation thereof accompanying the regulations issued by the Department of Agriculture in the following terms:

"The purpose of the Perishable Agricultural Commodities Act is to suppress unfair and fraudulent practices in the marketing of fresh fruits and fresh vegetables, whether frozen or packed in ice, and including cherries in brine, in interstate or foreign commerce. Therefore, all of its provisions will be so construed as to make them most effective to this end. It seeks to accomplish this by (1) requiring that commission merchants, dealers, and brokers subject to the act obtain from the War Food Administrator a license for which they must pay an annual fee of $10; (2) requiring that licensees keep such accounts and records as will show fully and correctly all transactions; (3) prohibiting fraudulent account-

ing, unjustifiable rejections or failures to deliver, and misbranding and other misrepresentations; and (4) authorizing the investigation of complaints, the issuance of reparation orders, the publication of facts concerning violations and the suspension or revocation of licenses."

While additional protecton and additional remedies are thus provided to shippers of perishable commodities, the statute was not intended to repeal the law of sales or to destroy the rights and liabilities of the contracting parties thereunder. See A. J. Conroy, Inc. v. Weyl-Zuckerman & Co., D.C.Calif., 39 F.Supp. 784; Pasco County Peach Corp. v. J. F. Solley Corp., 4 Cir., 146 F.2d 888. It is true that the regulations promulgated by the Secretary enumerate certain trade terms and declare that they shall be given certain defined meanings when used in a contract of sale. For example, Section 46.24 of the Regulations includes the following paragraphs:

"(i) 'F. o. b.' * * * means that the produce quoted or sold is to be placed free on board the boat, car, or other agency of the through land transportation at shipping point, in suitable shipping condition * * * and that the buyer assumes all risk of damage and delay in transit not caused by the shipper, irrespective of how the shipment is billed. The buyer shall have the right of inspection at destination before the goods are paid for, but only for the purpose of determining that the produce shipped complied with the terms of the contract or order at time of shipment, subject to the provisions covering suitable shipping condition. Such right of inspection shall not convey or imply any right of rejection by the buyer because of any loss, damage, deterioration, or change which has occurred in transit.

* * * * * *

"(l) 'F. o. b. acceptance' means the same as 'f. o. b.' except that the buyer assumes full responsibility for the goods at shipping point and has no right of rejection on arrival, nor has he any recourse against the shipper because of any change in condition of the produce in transit, unless the produce when shipped was not in suitable shipping condition * * *. The buyer's remedy under this method of purchase is by recov-

158

ery of damages from the shipper and not by rejection of the shipment.

"(m) 'F. o. b. acceptance final' means that the buyer accepts the produce f. o. b. cars at shipping point without recourse."

█ The phrase "f. o. b. acceptance final" is found in the contract in suit, and it is therefore important to ascertain its meaning; for while the statute does not purport to change the substantive law of sales, it is obvious that the rights of the parties must be governed by the terms of the contract. On its face the phrase does not purport to enlarge the right of a buyer of perishable commodities in the rejection of the goods but rather restricts his privileges in this direction. The defendant seems to concede the truth of this observation. His position is that if the seller in a contract which contains this phrase delivers according to the contract, or if the buyer accepts delivery, the buyer has absolutely no recourse against the seller except for fraud. Hence the defendant says that it was of the utmost importance to him that the seller meticulously comply with the terms of his contract since this document was his only protection. By this line of reasoning the defendant asks the court to lay aside the law of substantial compliance with contracts and to apply the strictest and most technical construction possible to the contract in suit in regard both to the dates of the inspection and the dates of shipment of the commodities.

This position is not tenable and it does not accord with the construction placed upon the phrase "f. o. b. acceptance final" by the decisions of the Department of Agriculture. It is of course true that if a seller delivers produce in strict accordance with the terms of the contract, the buyer has no defenses; but it is not correct to say that if a buyer accepts delivery of a shipment "f. o. b. acceptance final" he has no remedy against the shipper whatsoever except in cases of fraud. It may be conceded that the declaration in paragraph (m) of Section 46.24 that the buyer accepts the produce without recourse, taken by itself, seems to leave him without any right of recovery; but this paragraph must be read in connection with the definitions set out in paragraphs (i) and (l) above quoted. When this is done it becomes apparent that the

buyer surrenders his right of rejection under either the (l) or the (m) form of contract, but that the buyer under the (l) form of contract is entitled to recover damages for a change in the condition of the produce during transit, if the change was due to the fact that the produce was not shipped in suitable shipping condition, whereas the buyer under the (m) form of contract does not have a right of recovery for such damages. In other words, the buyer's right to recovery is more restricted under paragraph (m) than under paragraph (l). Nevertheless the buyer under either form of contract may recover from the seller for damages caused by the latter's failure to comply with the contract as to the character of the goods, the time of shipment or other material provision of the agreement.

This interpretation has been placed upon the phrase by rulings of the Department of Agriculture in cases adjudicated under the statute. In Nick Argondelis v. Senter Bros., Inc., May 15, 1945, 4 Agriculture Decisions 420, the Department considered the defenses of a buyer who had rejected a carload of strawberries on the grounds that the number of the car and the date of shipment differed from those specified in a contract f. o. b. acceptance final.

The Secretary held that neither circumstance constituted a good defense, pointing out that even if the time of shipment was of the essence of the contract, shipment of the car one day late was a sufficient compliance, and also that the goods shipped were those intended for the buyer even though not contained in the car specified in the broker's memorandum, and that the goods were of the quality called for by the contract. In the course of his opinion the Secretary said: (4 A.D. 424)

"* * * It is needless, however, to further discuss the points raised since the contract of sale was on an f. o. b. acceptance final basis. This term as understood in the trade meant that respondent had no right of rejection and was without recourse for any change in quality or condition during transit. If other specifications stated in the contract, such as grade or quality at shipping point, or time of shipment, were breached, the respondent would be entitled to recover for losses shown to have been

sustained. D. B. Brunt & Co., Inc. v. S. Goldsamt, Inc., 1 A.D. 605. Here the respondent rejected the shipment in violation of the contract."

See also L. Gillarde Co. v. Ritter Co. et al., July 16, 1945, 4 A.D. 594; L. Gillarde Co. v. Joseph Martinelli & Co., July 3, 1946, 5 A.D. 555, and the decision in the pending case, March 25, 1946, 5 A.D. 214.

We see no occasion to depart from this construction of the regulation by the issuing authority. It complies with the spirit and serves the purpose of the Act to prevent or at least to minimize the unreasonable rejection of perishable commodities without interfering with the general rights of the parties to sales contracts which have been so carefully worked out in the decisions of the courts and in the uniform sales acts so widely adopted in the states of the union. Certainly the use of the restrictive phrase in the contract under consideration adds no strength to the buyer's defense. We have no hesitation in rejecting the buyer's argument that we should give a strained interpretation to the contract so as to impose upon the shipper the strictest compliance with the terms as to shipment without regard to the justice of the situation and the realities of the business world. To do so in the pending case would serve only to distort the law for the benefit of one whose unreasonable rejection of the commodities was the very sort of conduct that the statute was designed to prevent.

It is clear when the facts of the instant case are considered in the light of the law of sales and the provisions of the Perishable Agricultural Commodities Act and the regulations issued thereunder that the seller committed no material breach of the contract either as to the time of the inspection or the time of the shipment of the goods, and that the buyer suffered no damages of any kind since the goods when shipped and when resold after the buyer's rejection were of the kind and quality specified in the contract. The judgment of the District Court will therefore be reversed and the case remanded to the District Court for further proceedings in accordance with this opinion.

Reversed and remanded.