C. T. NEALE, JR., ET AL.

V.

IRVIN BARTON JONES, III

Record No. 830518

October 10, 1986

Present: All the Justices

Herbert V. Kelly (Harry J. Kostel; Jones, Blechman, Woltz and Kelly, P.C., on briefs), for appellants.

Stephen C. Conte (David Meade White; White, Blackburn & Conte, P.C., on brief), for appellee.

COMPTON, J., delivered the opinion of the Court.

This is an appeal from an interlocutory decree in chancery, in which we determine whether the trial court properly denied rescission of leases of sand and gravel mining rights.

In 1981, appellants C. T. Neale, Jr., June E. Neale, Martha Snead Neale, C. T. Neale, III, Mary W. Neale, Albert E. Neale, and William E. Neale, filed a bill of complaint in the court below against appellee Irvin Barton Jones, III. The controversy arose from two nearly identical leases pertaining to 1,565 acres of land in Caroline County. Known as the "Goose Pond Tract," the property lies adjacent to the Mattaponi River. The Neales were lessors and Jones was lessee along with Bernard W. Armentrout, who later assigned his interest in the leases to Jones. The lessors contended that the lessee had committed substantial and material breaches of the leases. They asked the court to enter a decree "rescinding, terminating, and cancelling" the leases and to order the lessee "to evacuate" the property.

Following a November 1982 ore tenus hearing, the chancellor found that the lessors were not entitled to rescission and continued the cause for further proceedings. We awarded the lessors an appeal from the December 1982 decree embodying that ruling.

The evidence shows that the lessors owned, with varying interests, the land in question, consisting of two tracts. Some of the lessors had mined the land for approximately 24 years before the leases were executed. The leases, dated December 8, 1978 for terms of 99 years to commence January 2, 1979, permitted the lessee to occupy the land for the purpose of mining sand and gravel. The leases provided, for example, for payment of royalties to the lessors at specified rates, for the right of the lessors to sell the property if mining rights were reserved to the lessee, for reclamation by the lessee of all areas mined, for the lessors to grant rights to others to use the land not being mined for such purposes as farming, cutting timber, and hunting, for the right of first refusal in the lessee to purchase the property, for the lessee to have the right to mine sand and gravel until the supply is exhausted, and for termination of the leases by the lessors if the lessee did not comply with the terms governing selling tonnage or paying royalties.

The following provision, common to both leases, is the focus of this controversy:

"Two years from date of contract to mine, all the land will be tested for sand and gravel. Land not containing sand and gravel suitable for mining will be released to Lessor [sic]. Lessors must be notified in advance of tests so they may be present if they choose. At this time the full and unencumbered rights will revert to the Lessors, except those parcels containing sand and gravel [which] can be mined and have been so designated on the plat of the property as initialled by the parties hereto."

The parties have adopted January 2, 1979 as the beginning of the two-year period.

The lessors assigned six errors in their petition for appeal but ultimately argued only one question, expressly abandoning all other assignments of error. The question raised is whether the trial court erred in failing to find that the lessee had violated the

foregoing lease provision and in failing to rule that the lessors were entitled to rescission of the lease agreements.

A detailed recitation of the evidence is not necessary. It is sufficient to note that the lessors presented lay and expert testimony that, while the lessee performed some testing, he failed to test the entire property for sand and gravel. The lessors maintained that at least one test hole per acre should have been dug. The lessors further showed that the lessee's testing was performed in an improper and inadequate manner. In addition, the principal lessor, C. T. Neale, Jr., testified he was not given notice "in all instances" of the digging of test holes. He stated, however, that he was present when a "vast number" of test holes were dug by lessee's agent. The lessors produced evidence that locations of test holes on a plat, prepared on the lessee's behalf for the purpose of designating sand and gravel deposits, could not be located on the ground at the places indicated on the map and that a map required by the lease provision was never initialled by the parties. Also, lessors proved that an examination of the lessee's test results revealed a number of areas which contained no deposits of sand and gravel.

In contrast, evidence favorable to the lessee showed that the entire property contained deposits of sand and gravel. Bernard W. Armentrout, owner of Armentrout Septic Tank Corporation and called as a witness for the lessors, testified that he tested the land at the lessee's request. Armentrout said he used "a backhoe and dug holes over the entire piece of land, or just as close as I could over the entire piece of land." He stated that during the fall of 1980 he performed the assigned work in 15-17 days digging 179 test holes on the property. He recorded the location of the test holes on a plat and prepared a written report of the material found as the result of the tests. The lessors admit the plat was completed during January 1981.

In addition, the lessee presented expert testimony that the testing performed by Armentrout "was more than adequate to determine that [sand and gravel] existed on the property." In fact, according to lessee's expert, who performed his own testing, sand and gravel were present "over the entire property in some form."

The lessee testified that he found the plat prepared by Armentrout accurate and that the test holes were in the approximate location as depicted on the map. He said the testing was completed within the required two-year period and, in his opinion, the

property had been "overtested for the existence of sand and gravel."

In the course of announcing his decision at the conclusion of the hearing, the chancellor expressed concern that the terms of the leases did not specifically cover some of the points of disagreement among the parties. For example, the court observed that the lease did not provide that one test be made of every acre of the property, a requirement insisted on at trial by the lessors.

The chancellor decided "that the lease should not be rescinded." Commenting further, the court said "there are still a lot of questions unanswered as far as the future is concerned . . . ." The judge stated, "I do not think the question has been decided yet as to which portions of that property are suitable for mining in the future and which are not." Continuing, the chancellor said, "I think that is a wide open thing right now." The court also commented that the parties "are going to be back in court again, because . . . they cannot agree on the plat. They have not initialed the plat. They cannot agree on the areas that are suitable for mining, and the ones that are not."

Subsequently, the chancellor provided, in the decree appealed from, that the lessors "are not entitled to rescission of the two leases" and that the lessors' "prayer for rescission is hereby denied." The chancellor further decreed: "This cause is continued for further proceedings to determine which parcels of the property that is the subject of such leases will be released to the [lessors] . . . ."

 There is no disagreement among the parties about the principles of law applicable to this case. The decision of a suit for rescission, the counterpart of a suit for specific performance, is addressed to the sound discretion of the trial court. *Bolling* v. *King Coal Theatres*, 185 Va. 991, 996, 41 S.E.2d 59, 62 (1947). "Ordinarily, rescission will not be granted for breach of a contract which is not of such substantial character as to defeat the object of the parties in making the contract. . . ." *Id.*, 41 S.E.2d at 62.

The lessors contend that the breach here was substantial. They argue that the lessee "failed to perform under [the lease provision in question] in that the tests were not completed and a plat was not provided within the two-year period." Further, the lessors argue that the lessee "did not give notice for all of the testing . . . and the testing was not adequate." Relying on comments made by the chancellor from the bench, the lessors say the trial court actu-

ally found as a fact that the lessee failed to perform, as alleged, and that such finding of fact "mandates a rescission of the leases as contemplated by the parties when they entered into those leases." The lessors contend that the court's refusal to force compliance with the terms of the leases results in an unwarranted reformation by the court of the parties' written agreement.

■ We do not agree. The lessors misinterpret the pertinent lease provision and, contrary to settled principles of appellate procedure, rely only on their own evidence to the exclusion of the contrary evidence presented by the lessee, in whose favor the court decided after an ore tenus hearing. Because the ruling to deny rescission was based on disputed facts in the trial court, we view the facts on appeal in a light most favorable to the lessee, who prevailed below.

Contrary to the lessors' position, the leases do not provide that a plat was to be provided within the two-year period. The two-year period mentioned in the first sentence of the lease provision applies only to the time within which the testing was to be accomplished. All the evidence shows that Armentrout's testing was completed during the fall of 1980, well within two years from January 1979. The requirement for presentation of a plat, contained in the last sentence of the lease provision, carries no time limit. And the lessors concede that a plat, albeit uninitialled, was completed during January 1981, which was within a reasonable time.

Furthermore, the lease is silent about the number of test holes to be dug, about the method to be used in testing, and about how the test results were to be recorded on the plat, whether by the use of compass directions or a grid system. Yet, the lessors urge that the lessee has breached the agreement because the methodology advocated by their own expert was not employed by Armentrout. It is apparent that the chancellor gave credence to the testimony of Armentrout and the lessee's expert to the effect that the entire land was tested properly and that the results were adequately recorded in compliance with the lease provision. Therefore, the trial judge decided that there was no defect in the testing that created a sufficient basis upon which to rescind the leases.

In addition, there was evidence to support a finding that the main lessor had advance notice of the testing. Neale testified that he was present when a "vast" number of the holes were dug. Incidentally, the lessee testified that the testing was delayed until the fall of the second year of the period so Neale could be present

because Neale was "out of commission for over a year" due to a serious health problem. The lessee stated, "We scheduled our testing to conform with his health, and what he was able to do."

We turn to the chancellor's comments from the bench, criticized by the lessors as being at odds with the court's ruling. We find they are wholly consistent with his ultimate decision to deny rescission.

In the course of announcing his conclusion to refuse rescission, the trial judge correctly observed that no decision had been reached, according to the terms of the leases, "as to which portions of that property are suitable for mining in the future and which are not." The lessors argue this type of comment demonstrates that the court found the testing was inadequate and thus was equivalent to no testing at all. We construe the chancellor's remarks differently. We interpret the trial judge to have meant that, because the lessors have refused to initial the plat and have refused to agree to the accuracy or credibility of Armentrout's notations on the plat, it is not possible, within the terms of the leases, to ascertain those portions of the land, if any, which do not contain sand and gravel deposits and which revert to the lessors according to the lease provision.

This kind of observation by the chancellor is consonant with his ruling that the lessors failed to sustain their burden to prove that any acts of omission or commission of the lessee were, in the language of *Bolling*, "of such substantial character as to defeat the object of the parties in making the contract." In other words, the central purpose of the leases, *i.e.*, to permit mining of sand and gravel, has not been defeated merely because the parties cannot agree on what Armentrout's tests reveal. Even though all the land was tested within the two-year period, according to the evidence accepted by the chancellor, the crucial determination of which land reverts cannot be made according to the lease terms until there has been a designation on a plat initialled by the parties. Consequently, we hold the trial court did not abuse its discretion in holding that the lessors had not made out a case for rescission but that further proceedings should be had, in the language of the decree, to "determine which parcels of the property that is the subject of [the] leases will be released" to the lessors.

For these reasons, the decree appealed from will be affirmed and the cause remanded for further proceedings.

*Affirmed and remanded.*