RESTON RECREATION CENTER ASSOCIATES

V.

RESTON PROPERTY INVESTORS LIMITED PARTNERSHIP

Record Nos. 871175 and 880097

September 22, 1989

Present: All the Justices

420

*John E. Harrison (Sandra L. Hughes; Adam D. Elfenbein; Johnna S. Spera; Light & Harrison, P.C.*, on briefs), for appellant.

*Stephen K. Fox (Bernadette A. Fritschie; William L. Carey; Fox & Proffitt, P.C.; Miles & Stockbridge*, on brief), for appellee.

Justice Whiting delivered the opinion of the Court.

This dispute over a landlord's termination of a commercial lease before its scheduled expiration presents a number of issues. They are primarily: (1) whether the lease obligated the tenant to main-

tain public liability insurance coverage for its alleged subtenant's business activity on the premises; (2) if so, whether either the doctrine of impossibility of performance or a provision of the lease prevented the landlord from terminating the lease when the tenant failed to maintain such insurance; (3) whether the tenant lost the benefit of favorable lease provisions by failing to vacate the premises on the landlord's demand; and (4) if termination was proper, the appropriate measure of damages for the tenant's retention of the premises.

The trial court decided most of the issues against the tenant by summary judgment. Therefore, in conformity with well-settled appellate principles, we review the pleadings and admissions relative thereto in the light most favorable to the tenant.

By lease dated February 6, 1981, Reston Racquet Club Associates (the landlord) let 4.7595 acres, improved by a building, in which it had operated a recreational center in Reston, to Reston Recreation Center Associates, a limited partnership (tenant), for "roller rink, tennis, racquetball, gymnastics and related recreational center uses." The lease obligated the tenant to make a number of additions and modifications to the premises, including the installation of a roller skating rink.

Paragraph 15(A) of the lease required the tenant to "*maintain* at Tenant's sole cost and expense, for the benefit of Landlord and Tenant, insurance *with respect to the premises*, of the following types and in the following amounts: . . . (3) *[p]ublic liability insurance* with limits of at least . . . $5,000,000 for the injury to more than one person in one accident or occurrence." (Emphasis added.) Effective February 27, 1985, paragraph 15(A)(3) was amended to provide that the required public liability insurance would include "host liquor liability insurance if available, in the event that alcoholic beverages are served on the premises by Tenant, its agent or employees."

In another paragraph of the February 27, 1985 amendment, the landlord approved the tenant's sublease of a portion of the building to Reston Home Owners Association (Home Owners), for the operation of a fitness center, tennis and racquetball courts, and related facilities. Paragraph 15 of the sublease required Home Owners to maintain a $5,000,000 public liability insurance policy with a "combined single limit on account of bodily injuries to or death of persons and damage to property with host liquor liability insurance" for the benefit of the landlord, the tenant and Home

Owners. On June 1, 1985, with the landlord's written consent, the tenant subleased another portion of the building to Specs Of Herndon, Inc. (Specs) for gymnastic and exercise training, with the same provisions for public liability insurance as in paragraph 15 of Home Owners' sublease.

Until October 2, 1985, the tenant caused public liability insurance in the required amounts to be maintained protecting the landlord, the tenant, and the tenant's sublessees in the occupation and use of the premises, including their business activities thereon. Such insurance covered the operation of the roller skating rink by a corporation known as Reston Roller Rink, Inc., which had operated the rink until some time in 1983, as well as the tenant's operation thereafter. Effective October 2, 1985, the tenant's public liability insurance carrier cancelled coverage on the roller skating activities. Despite diligent effort, the tenant was unable to obtain public liability coverage for its operation of the rink from other insurance companies; nevertheless, it continued its operation.

On December 23, 1985, the landlord notified the tenant of its alleged default, and gave the tenant a 30-day period, required by paragraph 28(A)(2) of the lease, in which to cure the default or risk termination. On January 22, 1986, the tenant created a wholly owned subsidiary corporation, Reston Recreation Center, Inc. (Skateway) to operate the rink. On the same day, the tenant secured a five million dollar public liability insurance policy which covered the landlord and the tenant in its capacity as "the prime tenant," and included their business activities upon the premises. The tenant, however, was only able to secure a $500,000 policy for Skateway's operation of the rink.

On April 18, 1986, the landlord issued a notice terminating the lease, as provided by paragraph 28(A) thereof, alleging a failure to maintain the required insurance, and demanded possession five days after receipt of the notice. The tenant admits receiving this notice shortly after it was sent, but did not surrender the premises as required.

Paragraph 13 of the lease, supplemented by a letter addendum dated February 6, 1981, gave the landlord the right, upon the expiration of the term of the lease, to retain the furniture, fixtures, and machinery installed by the tenant but obliged the landlord to pay the tenant $225,000 if the right were exercised. On April 24, 1986, the landlord gave the tenant written notice of its exercise of the right.

On April 28, 1986, the landlord sold the premises to Reston Property Investors Limited Partnership (successor landlord). The successor landlord admits knowledge of the original lease, but not of the February 6, 1981 letter addendum. The lease documents were not recorded.

On June 27, 1986, the successor landlord filed this unlawful detainer action to recover possession of the premises. On June 29, 1987, the trial court sustained the successor landlord's motion for summary judgment for possession.

The tenant filed a counterclaim contending that, because the landlord had exercised its right to retain the tenant's property in its April 24, 1986 notice of election, the successor landlord owed it $225,000, whenever and however the landlord regained possession of the premises. On October 23, 1987, the counterclaim was dismissed upon the successor landlord's motion for summary judgment. We granted the tenant an appeal from that ruling. (Record No. 880097.)

On June 12, 1987, the successor landlord filed an amended motion for judgment seeking damages for the tenant's retention of the premises after the lease had been terminated. At a trial upon that issue, a jury returned a $112,275 verdict for the successor landlord. On July 17, 1987, the trial court entered judgment on the verdict, and we granted the tenant an appeal from that ruling and the previous summary judgment ruling on the issue of possession (Record No. 871175), in addition to the previously granted appeal. We consolidated both appeals for argument and decision.

## I.

The tenant contends that it did not breach the insurance requirements of paragraph 15(A)(3) of the lease, because that paragraph: (1) unambiguously limited its obligation to maintaining public liability insurance coverage for claims arising out of defects in the premises; and (2) did not require coverage for claims arising out of the operation of any business thereon. If that construction is erroneous, the tenant claims that the language is at least ambiguous and that the trial court should have submitted the issue to the jury.

The term "public liability insurance" is generic, and requires agreement as to the coverage or risks insured. 11 G. Couch, *Cyclopedia of Insurance Law* § 44:247 (2d ed. 1982). The only written agreement of the parties was that such insurance should

be "with respect to the premises," and in the amounts specified; the parties did not specify the type of public liability insurance required. During the first four years of the lease, the tenant caused the maintenance of $5,000,000 of business activity public liability coverage on the premises, and the landlord acquiesced therein. This practical construction by the parties of the terms of the lease defined the type of insurance required therein, and thereafter bound the tenant to continue such coverage. *See Dart Drug v. Nicholakos*, 221 Va. 989, 995, 277 S.E.2d 155, 158-59 (1981).

■ Alternately, the tenant contends that its subsequent sublease to Skateway, a separate entity, relieved it of its obligation because the lease did not require it to maintain such insurance for a sublessee's activities on the premises. The tenant admits, however, that the landlord did not consent to the sublease, as required by paragraph 18 of the lease. One obvious reason for requiring a landlord's consent to a sublease is to permit the landlord to retain control over the terms under which any sublessee occupies the premises. That the parties envisaged retention of such control is underscored by a consideration of the language of the second sentence of paragraph 11, dealing with the use of the premises. Therein, the tenant is prohibited from permitting a licensee or concessionaire to operate a business on the premises without obtaining the landlord's prior written consent. Under these circumstances, we hold that the landlord could ignore the sublease and continue to treat the tenant as the occupant. *See Owens v. Oglesby*, 123 So. 2d 521, 524 (La. Ct. App. 1960); *Digby v. Hatley*, 574 S.W.2d 186, 189 (Tex. Civ. App. 1978).

■ The tenant also relies upon a provision in paragraph 18 of the lease, relieving it of its obligation to obtain landlord consent to a sublease, where "the effect of any such transfer is only to change the form of business entity or organization of the Tenant." But the tenant did not change its "form"; it created a subsidiary to operate the rink. Because the subsidiary is considered a separate entity and was, therefore, a stranger to the lease, landlord consent to the sublease was required. *See Lord Baltimore Filling Stations v. Hoffman*, 117 A.2d 397, 398 (D.C. 1955). Because the tenant did not have the requisite consent for Skateway's operation of the rink, the landlord could regard the tenant as its operator, and require the tenant to provide such insurance.

■ The tenant posits that its maintenance of a $5,000,000 public liability insurance policy to protect it or its "subtenant" from

liability in the operation of the rink was not really necessary for the landlord's protection, and that its failure to do so could not be considered a material breach of the lease. We are not concerned with the necessity for such insurance, because the tenant agreed to provide it. Furthermore, if the tenant failed to cure the default after notice thereof, the provisions of paragraph 28 of the lease gave the landlord the right to terminate the tenancy, regardless of the materiality of the breach. *See Coal Company* v. *Combs*, 204 Va. 561, 571, 132 S.E.2d 399, 406 (1963); *Olson* v. *Pedersen*, 194 Neb. 159, 165, 231 N.W.2d 310, 314 (1975); *Assoc. Cotton Shops* v. *Evergreen Pk. Shopping*, 27 Ill. App. 2d 467, 473-74, 170 N.E.2d 35, 37-38 (1960); *City of Douglas* v. *Douglas Canning Company*, 161 F. Supp. 379, 385 (D. Alaska 1958).

## II.

■ The tenant argues that, even though it might have been required to maintain business activity insurance on the rink, its failure to do so was excused by the doctrine of impossibility of performance. Even if the doctrine were applicable under these circumstances, an issue we do not decide, the obvious flaw in the tenant's attempt to invoke it is that when the doctrine is applied, it excuses future performance by *both* parties. *Paddock* v. *Mason*, 187 Va. 809, 816, 48 S.E.2d 199, 203 (1948). We have found no case, and the tenant cites none, which holds that a party whose non-performance has been excused thereby may use the doctrine as a sword to compel the other party to accept performance different from that agreed upon.

■ To assure the landlord that the tenant, or its subtenant, would be able to continue to pay the rent and perform the other covenants in the lease despite any liability arising out of any public liability claims, the tenant agreed to maintain the insurance coverage against such claims arising out of any business conducted upon the premises. We cannot amend the contract to require the landlord to accept the tenant without that assurance.

■ The tenant also claims its non-performance is excused by paragraph 33 of the lease, providing in pertinent part:

> *FORCE MAJEUR*: In the event that either party hereto shall be delayed or hindered in or prevented from the performance of any act required hereunder by reason of strikes, lock-outs, labor trouble, inability to procure materials, failure

of power, restrictive governmental laws or regulations, riots, insurrection, war or other reason of a like nature not the fault of the party delayed in performing work or doing acts required under the terms of this Lease, then performance of such act shall be excused for a period equivalent to the period of such delay.

In our opinion, this excusal of non-performance for a limited period binds both parties to a modified performance, and thus is a contractual expansion of the doctrine of impossibility which "becomes the law of the case unless it is repugnant to some rule of law or public policy." *Winn* v. *Aleda Const. Co.*, 227 Va. 304, 307, 315 S.E.2d 193, 194 (1984).

 Because the case was decided on summary judgment, we must assume that no public liability insurance carrier would issue a policy covering the operation of the rink in an amount greater than $500,000, due to no fault of the tenant, and despite its diligent efforts to obtain such insurance. In our opinion, such a refusal is a situation "of like nature" to a strike or an inability to procure materials, and, therefore, pursuant to the provisions of paragraph 33, the tenant's obligation to maintain such insurance would be modified accordingly during any such period. Thus, the trial court erred in sustaining the landlord's motion for summary judgment, because the tenant's assertion of this defense turned on an issue of fact.

 Since the case will be remanded for trial, we decide other issues raised on this appeal which may arise on remand. The first such issue is the tenant's claim that paragraph 28(A)(2) prevents the landlord from terminating the lease. That paragraph gives the landlord the right to terminate the lease if a default is not cured within 30 days after notice, but also provides that:

Tenant's time to cure such default shall be extended for such additional time as shall be reasonably required for the purpose if Tenant shall proceed with diligence during such 30 day period to cure such default and is unable by reason of the nature of the work involved to cure the same within the said 30 days, and if such extension of time shall not subject Landlord or Tenant to any liability, civil or criminal, and the interest of Landlord in this Lease shall not be jeopardized by reason thereof.

We believe the proviso is inapplicable here because the interests of the landlord in future rental payments would be jeopardized if the operator of the rink, whether the tenant in another form or its subsidiary, were subjected to civil liability arising out of a public liability claim for which there was inadequate insurance.

The tenant argues that, when the default provisions of paragraph 28 and the insurance requirements are read in light of the *force majeur* clause and a letter written by the landlord to the tenant on the day the lease was signed, the landlord is "virtually compelled" to accept the reduced insurance coverage and "to agree to amend the Lease accordingly." That letter states:

> The parties to the referenced Lease have agreed that it is and should be and remain mutually beneficial. In that spirit, Reston Racquet Club Associates agrees that if, for example, gross sales are less than $800,000, it will negotiate in good faith upon such terms as are mutually agreeable.

Even if this were a suit in equity to compel the successor landlord to agree to such an amendment, we could not enforce agreements to negotiate. *See Duke* v. *Tobin*, 198 Va. 758, 759, 96 S.E.2d 758, 760 (1957).

### III.

The tenant contends that the successor landlord was required to pay it $225,000 because of the landlord's election requiring the tenant to leave its personal property on the premises upon termination of the lease. If the tenant wanted to hold either landlord to this election, however, it was obliged to comply with the landlord's demand to surrender the premises.

The right to such payment is lost if the landlord is forced to resort to legal action to obtain possession. *Cf. Binder* v. *Gunsenhiser*, 217 Mass. 518, 519, 105 N.E. 459, 459 (1914) (tenant lost right to agreed liquidated damages provided in lease for early termination by refusing to accept tender thereof, and adversely holding premises until evicted by court order); *Outhouse* v. *Baird*, 121 N.Y. App. Div. 556, 557, 106 N.Y.S. 246, 247 (1907) (tenant's refusal to vacate farm upon sale prior to expiration of lease and his subsequent eviction resulted in loss of lease-created right to claim reasonable value of crops planted when notice given). Accordingly, the tenant's failure to surrender possession upon the

landlord's demand, whether that demand was justified or not, precludes the tenant from holding either the original landlord or the successor landlord to the election to purchase the personal property.

## IV.

■ We decide the appropriate measure of the successor landlord's damages for the period in which the tenant remained in possession of the premises after notice to vacate, should the fact finder conclude that the landlord was justified in terminating the lease. According to the tenant, paragraph 28 did not authorize the landlord's five-day notice to vacate; instead the tenant was entitled to the 30-day notice specified in paragraph 34 because it had become a month-to-month tenant by holding over after expiration of the lease.

■ We reject the argument. Paragraph 28 explicitly provides that after five days' notice of the landlord's election to terminate the lease because of the tenant's uncorrected default, "all rights of Tenant under this Lease shall expire and terminate." Thereafter, the tenant ceased to be a tenant and became a trespasser subject to being ejected. *McKildoe's ex'or* v. *Darracott*, 54 Va. (13 Gratt.) 278, 284-85 (1856). The tenant could not, by its wrongful act in failing to vacate the premises, convert its status from that of a trespasser to that of a tenant from month to month. *See id.*

Should the fact finder conclude that the original landlord was justified in terminating the lease, the trial court will again enter judgment on the jury's verdict. If the facts are found to be otherwise, the tenant will have no further liability for rent beyond those payments called for in the lease.

Accordingly, we will reverse the judgments and remand the case for further proceedings consistent with this opinion.

*Reversed and remanded.*