# Safeway, Inc., et al.

## v.

# The Plaza Company of Virginia

Record No. 930763

June 10, 1994

Present: Carrico, C.J., Compton, Stephenson, Whiting, Lacy, and Keenan, JJ., and Harrison, Retired Justice

*Steve C. McCallum (McGuire, Woods, Battle & Boothe,* on briefs), for appellants.

*Douglas W. Davis (Cynthia S. Cecil; Hunton & Williams,* on brief), for appellee.

CHIEF JUSTICE CARRICO delivered the opinion of the Court.

This case involves the provisions of a lease covering premises in a Lynchburg shopping center. From a final judgment in favor of the landlord, we awarded the tenant an appeal and will reverse.

The lease was entered into October 15, 1985, between Covington Properties of Lynchburg, Inc. (Covington), the then owner of the shopping center, as lessor, and Safeway Stores, Incorporated, as lessee. Running for a term of twenty years commencing November 1, 1986, the lease called for the construction by Covington of a store building on the leased premises in accordance with approved plans and specifications.

By the time the present action was filed, the appellee, The Plaza Company of Virginia (Plaza), had succeeded to the interest of the original lessor, Covington, and the appellants, Safeway, Inc. and Safeway Stores 58, Inc., had succeeded to the interest of the original lessee, Safeway Stores, Incorporated. We will refer to the several Safeway entities hereinafter by the name, "Safeway."

Two paragraphs of the lease, Nos. 4 and 20, are discussed in detail by the parties. However, because we think Paragraph 4 is conclusive of the outcome of this appeal, we will discuss only its provisions. In pertinent part, they read as follows:

> All those portions of the shopping center not shown as building areas on Exhibit "A" shall be common areas for the sole and exclusive joint use of all tenants in the shopping center, their customers, invitees and employees, and lessor hereby grants to lessee and its customers, invitees and employees the right of such exclusive joint use of all of said common areas. . . . Lessor further agrees that . . . following completion of construction of any portion of the shopping center, *the*

*sizes and arrangements of* . . . . common areas (including *parking areas* and traffic circulation and flow patterns) *will not be changed without lessee's written consent, and that . . . if said sizes or arrangements are changed without lessee's written consent, lessee may cancel this lease by notice to lessor.*

(Emphasis added.)

Exhibit "A," referred to in Paragraph 4, is the site plan for the shopping center. It shows the location of the store building to be constructed for Safeway on the lower level of the shopping center, as well as the locations of other buildings in the center. It also shows an area enclosed in rectangular lines containing an "X" mark and labelled "Future Bldg. Area," located in a northwest direction from, and outside the parking area in front of, Safeway's building.

Construction was completed about May 21, 1987, but Safeway decided not to open a store in the building, a decision prompted by a leveraged buy-out of Safeway in 1986. Instead, Safeway merely began paying the rent on the premises, as required by the lease.

In early 1990, Covington revealed plans to construct an eight-screen movie theater on the lower level of the shopping center. The location chosen by Covington was not in the position designated on the site plan as "Future Bldg. Area," but on the parking lot itself, directly across from, and almost due north of, Safeway's building.

Safeway objected to the proposed project, but Covington proceeded to construct the theater. As a result, approximately fifty parking spaces were eliminated. This loss reduced the available parking spaces below the number required by the local zoning ordinance, forcing Covington to seek a variance from the local board of zoning appeals.

On May 1, 1991, Safeway notified Plaza, which by this time had succeeded to the interest of Covington, that it was canceling the lease because of the construction of the theater and that "no further rent [would] be paid." Plaza refused to accept the cancellation and brought this action to collect accrued rent, amounting at the time to $21,366.67.* The trial court entered judgment in favor of Plaza for that amount.

---

* The total amount of rent for the remaining term of the lease is approximately $4 million. Safeway's store building is currently leased to another tenant, but at a reduced

In entering judgment against Safeway, the trial court ruled that Plaza had not "materially breached the lease in question." In so ruling, the court adopted an argument advanced by Plaza in a trial brief that, in order to cancel the lease, Safeway had to show that any breach by Plaza was material. Safeway contends that the lease did not require a showing of materiality, and Plaza now concedes, as well it might, that such a showing was not necessary to establish a breach of Paragraph 4. *See Spotsylvania County v. Seaboard Surety Co.*, 243 Va. 202, 211-12, 415 S.E.2d 120, 125-26 (1992). Hence, under Paragraph 4, all that Safeway had to show to establish a breach sufficient to justify canceling the lease was that Covington changed the size or arrangement of the parking area without Safeway's written consent.

Safeway contends it did establish that Covington changed the parking area without its written consent. No written consent was proven at trial, Safeway argues, and Covington's president admitted while on the witness stand that the parking area had been changed. Safeway points to this exchange between its counsel and Covington's president:

Q  What I'm asking you to agree, you changed the parking area by putting the new theater where you did, right?

A  Yes, sir, we did.

Plaza does not directly address Safeway's argument that Covington changed the size or arrangement of the parking area without Safeway's written consent. Instead, Plaza seems to content itself with this vague statement in its brief:

Through the reservation of the "Future Building Area" [on the site plan], Safeway had already agreed to the Plaza Company's future construction in the lower level of the Shopping Center. Thus, there was no need to obtain further consent from Safeway for that construction. The testimony bears this out.

The reservation on the site plan, however, simply cannot suffice as written consent by Safeway to a change in the size or arrangement of the parking area. Indeed, at the time Safeway ex-

rental. As matters stand now, the shortfall for the remaining term of the lease is approximately $2.5 million.

ecuted the lease, which incorporated the site plan, the location where Covington later built the theater and eliminated approximately fifty parking spaces was shown on the plan as devoted to parking, without the slightest indication that any other use would ever be established in the parking area.

Nor does the testimony cited by Plaza indicate there was "no need" for Safeway's written consent to a change in the size or arrangement of the parking area. On brief, Plaza quotes from the testimony of a Safeway representative who agreed on cross-examination that the notation, "Future Bldg. Area," on the site plan meant that if, at some point in the future, the shopping center owner "opted to put a business in there," the owner "would not have to come back to . . . Safeway for any further consent." However, Plaza does not quote the witness's full testimony on the subject of what was meant by the notation on the site plan. A few lines later in the trial transcript, the witness testified that "in there" meant "within the confines of [the] rectangle" shown on the site plan as "Future Bldg. Area."

The theater was not built "in there," of course, but in the parking area, resulting in a change in the size or arrangement of the parking area. And the change unquestionably was without Safeway's written consent. Safeway had sufficient justification, therefore, to cancel the lease.

Accordingly, we will reverse the judgment of the trial court and enter final judgment here in favor of Safeway.

*Reversed and final judgment.*