**RW POWER PARTNERS, L.P., Plaintiff,**

v.

**VIRGINIA ELECTRIC AND POWER COMPANY, Defendant.**

**Civ. A. No. 3:95cv589.**

United States District Court,
E.D. Virginia,
Richmond Division.

Sept. 15, 1995.

Stephen A. Northup, Andrew G. Mauck, Mays & Valentine, Richmond, Virginia, Douglas G. Robinson, Glenn J. Berger, John N. Estes, III, Ellen L. Lyons, Skadden, Arps, Slate, Meagher & Flom, Washington, D.C., for Plaintiff.

G.H. Gromel, Jr., Michael R. Shebelskie, Hunton & Williams, Richmond, Virginia, for Defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

In this declaratory judgment action, RW Power Partners, L.P. ("RW Power") seeks a determination that the defendant, Virginia Electric and Power Company ("Virginia Power"), wrongfully terminated a contract between RW Power and Virginia Power for the sale and purchase of electrical power and generating capacity.[1] For the reasons set forth below, the court finds that Virginia Power was not entitled to terminate the contract.

## STATEMENT OF FACTS

RW Power is a Delaware limited partnership whose sole general partner is Ridgewood Electric Power Trust I and whose sole limited partner is We Gen, Inc. ("We Gen"), a North Carolina corporation. RW Power owns an electrical generation facility in South Boston, Virginia (the "Facility"). The Facility, its ancillary equipment and the Agreement are RW Power's only assets and its only business is the sale of the capacity of, and electricity generated by, the Facility. Virginia Power is a public utility company engaged in the generation and distribution of electricity. On February 20, 1992, We Gen entered into a contract entitled, an "Agreement for the Sale of Electrical Output to Virginia Electric and Power Company" (the "Agreement") by which We Gen agreed to sell to Virginia Power for a period of 29 years the capacity of the Facility and the electrical energy it produced. The Agreement was in the form of a standard contract prepared by Virginia Power for use in purchasing the capacity of, and electricity from, co-generation facilities such as the Facility. On October 16, 1992, the Agreement was assigned from We Gen to RW Power with the consent of all parties.

The Agreement requires RW Power to provide security for its performance under the contract in the form of an irrevocable

**1.** Originally, RW Power sought declaratory relief, permanent injunctive relief, and damages. On August 8, 1995, however, the parties agreed that the sole remedy sought by RW Power would be a declaratory judgment after a non-jury trial on the merits that Virginia Power's attempted cancellation was unlawful.

standby letter of credit. The letter of credit was to be in the amount of $36.00 per kilowatt of contracted capacity, or $104,400. Specifically, the Agreement provides:

SIXTH—Prior to the Commercial Operations Date, Operator shall provide, at Operator's sole expense, security for Operator's performance under this Agreement, in an amount equal to $36.00 per kW of the Contacted Capacity. *Operator shall maintain such security until the expiration of this Agreement to ensure continued availability of the Facility and to guarantee payment of obligations by Operator to Virginia Power.* Such security will be an unconditional and irrevocable direct pay standby letter of credit issued by a bank and in a form reasonably acceptable to Virginia Power. The Letter of Credit must provide for monthly draws by Virginia Power and permit presentation at a bank located in Richmond, Virginia, for same day funds.

Agreement, ¶ SIXTH (emphasis added).

As required by this provision, RW Power obtained from NationsBank a letter of credit which was effective from June 30, 1993 to June 30, 1994. Virginia Power was entitled to draw against the security the letter of credit provided for RW Power's failure to pay sums due Virginia Power under the Agreement. In addition, the letter of credit allowed Virginia Power to draw the full amount of the security ($104,400) within five days of its expiration if RW Power failed to deliver a renewal or replacement letter. The NationsBank letter of credit was renewed for the period June 30, 1994 through June 30, 1995. However, on May 25, 1995, five days before it was due to expire, NationsBank elected not to renew the letter of credit for an additional year.[2]

Either because RW Power had not responded to communications from NationsBank or because those communications had been misdelivered, RW Power first learned of NationsBank's decision not to renew the letter of credit when Virginia Power sent a telecopy of NationsBank's non-renewal notice to RW Power's Treasurer, Bruno Pettoni, on

May 25, 1995, the same day Virginia Power received it. On June 6, 1995, Pettoni informed Virginia Power's Ronald Hayes that RW Power had decided not to renew the letter of credit with NationsBank because its fees were too high. Pettoni also informed Hayes that RW Power would secure a replacement from another bank and asked Hayes to send a form letter of credit reflecting the terms required by Virginia Power. Hayes responded the same day, June 6, by providing the form.

Pettoni, however, was dilatory in pursuit of the replacement. He put the matter aside until June 19 when he began discussions with National Westminster Bank ("NatWest"), RW Power's regular commercial banker. In the ensuing several days, Pettoni communicated with Hayes about the replacement and assured him that a replacement would be timely issued. During the week of June 26, Pettoni telephoned Hayes and left messages requesting return calls. Hayes was on vacation during that week, but Pettoni made no effort to reach any other person at Virginia Power respecting the delay in securing a letter of credit from NatWest. On June 26, Pettoni finally sent to NatWest the Virginia Power form letter of credit he had received on June 6 from Virginia Power. Pettoni altered the date on the form from June 6 to June 26 because he feared that, if NatWest learned that the matter had languished for 20 days at RW Power, NatWest would not expedite the pending request to meet the June 30 date for issuance of the replacement. NatWest was unable to issue the replacement on June 30.

Thus, when Hayes returned to the office on July 3, he learned that RW Power had not secured the replacement which Pettoni had promised. Hayes also learned that Pettoni had telephoned on July 3 and on several occasions during the preceding week. Hayes, however, did not return those calls. Instead, Hayes, having recognized that RW Power was in breach of the Agreement, informed his superior, Jeffrey L. Jones, who, in turn, discussed the topic with Gary L. Edwards, Manager of Capacity Acquisition.

---

**2.** From May 26 to June 30, Virginia Power could have drawn on the full amount of the security under the terms of the NationsBank letter of credit, but it elected not to do so.

The purpose of these discussions was to confirm whether RW Power was in breach of the Agreement and whether the Agreement, therefore, could be terminated. After consulting with counsel, Virginia Power determined that RW Power was in breach of paragraph SIXTH of the Agreement and decided to terminate under Article XI, which provides that: "If Operator fails to perform any of its obligations pursuant to this Agreement, then Virginia Power may cancel this Agreement." The letter of termination was sent on July 5, 1995. It stated: "This letter will serve as notice that RW Power's failure to maintain security is a breach of the Agreement and, pursuant to Exhibit B, Paragraph XI, that Virginia Power is cancelling the Agreement effective July 5, 1995." The next day, Robert E. Swanson, president of RW Power, sent a letter to Virginia Power advising that a replacement letter of credit was in place, contesting the termination and asking that it be withdrawn.

At this point, it is necessary to place these developments in context. The Agreement was one of many so-called Schedule 19[3] contracts by which Virginia Power had agreed to purchase power and capacity from similar generating facilities pursuant to the requirements of the Virginia State Corporation Commission and in accordance with the directives of the Public Utility Regulatory Policies Act of 1978 ("PURPA").[4] These Schedule 19 contracts were reasonably advantageous when they were made, but by 1995 they had become costly and necessitated the purchase of electricity substantially above the then prevailing market price. As part of Virginia Power's strategy to reduce operating expenses, it determined that termination of contracts of this sort would result in substantial savings.

One of the strategies Virginia Power adopted to effectuate these savings was to strictly construe all of its contracts for the purchase of electricity and to terminate unfavorable agreements whenever possible. The Agreement was terminated on July 5, 1995 in implementation of this strategy. It is undisputed that Virginia Power suffered no damage as a consequence of the fact that there was no letter of credit in place from June 30, 1995 to July 6, 1995 and that injury, actual or potential, to Virginia Power in consequence of the breach was not considered in deciding to terminate the Agreement.

Nor is it disputed that strict adherence to contract terms represented a change of approach in Virginia Power's policies respecting contract administration which previously had been somewhat forgiving of conduct considered to be a breach of its contracts. For example, in response to RW Power's interrogatories which asked whether any supplier had "fail[ed] to perform any of its obligations" under similar contracts, Virginia Power produced a three-page chart listing breaches of twenty different contracts. In only three of those twenty cases did Virginia Power cancel the contract. The breaches that precipitated cancellation included failure to generate electricity for six months and failure to pay facilities charges. The breaches which did not bring about cancellation included a failure to conduct relay, calibration, and operational tests and a failure to provide a letter of credit.[5] Indeed, there were two instances in 1992 where minor breaches of the present Agreement did not produce termination by Virginia Power.[6] In early 1995, however, Larry W. Ellis, Senior Vice–President of Power Operations and Planning at Virginia Power reinstituted an aggressive program initiated in 1992 to re-

3. Schedule 19 is a tariff entitled "Power Purchased from Cogeneration and Small Power Production Qualifying Facilities."

4. Pub.L 95–617, Nov. 9, 1978, 92 Stat. 3117. PURPA was passed to reduce the country's dependence on imported oil by promoting the development of electric power projects.

5. This failure was remedied pursuant to a cure provision in the contract.

6. On June 20, 1992, Gary L. Edwards of Virginia Power wrote a letter to We Gen noting the project was 50 days late in providing certain information required by the Agreement but he did not cancel the Agreement. Then on August 14, 1992, the manager of the WeGen project wrote to Virginia Power requesting a two-month extension of the financial closing date. Mr. Edwards agreed to this extension even though the financial closing date was one of three preparational "material" requirements permitting termination under paragraph EIGHTH of the Agreement.

duce the number of Schedule 19 contracts from its system and resolved to no longer waive any non-compliance with Schedule 19 contracts. ·

Thus it was that RW Power's dilatory approach to its contractual obligations under paragraph SIXTH collided head-on with Virginia Power's desire to eliminate all contractual obligations to purchase power under the Agreement and others like it, if that could be lawfully accomplished. Because the duty to maintain a letter of credit was an obligation under the Agreement, and because of RW Power's undisputed breach of that obligation, Virginia Power asserts that it was within its rights to terminate the Agreement under Article XI.[7]

RW Power argues that its brief delay in securing a replacement letter of credit was a "minor, technical and fleeting" breach, which was not material because it did not undermine or even affect the main purpose of the contract, which was the purchase and sale of electric power. In addition, RW Power argues that it promptly cured the non-material breach before Virginia Power sustained any damage and that this precludes termination. According to RW Power, if Virginia Power was truly concerned about losses it might have sustained during an unsecured period, Virginia Power was entitled to liquidate the entire amount of the letter of credit during the five days before expiration of the NationsBank letter (June 26 to June 30, 1995) when it received no renewal or replacement letter. Finally, RW Power alleges that Virginia Power's hair trigger cancellation of the Agreement in the absence of injury demonstrates a desire to avoid honoring a contract that it regards as no longer commercially advantageous. Consequently, RW Power claims that Virginia Power wrongfully terminated the Agreement and breached its duty of good faith and fair dealing.[8]

## DISCUSSION

■ Resolution of this dispute necessitates consideration of two well-settled tenets of Virginia's common law of contracts which are in conflict in this action. First, there is the cardinal principle that "[b]efore partial failure of performance of one party will excuse the other from performing his contract or give him a right of rescission, the act failed to be performed must go to the root of the contract." *Neely v. White*, 177 Va. 358, 366, 14 S.E.2d 337, 341 (1941).[9] Second, there is the equally significant rule that the parties, by agreement, may abrogate such common law principles and, when that occurs, the courts must enforce the clear terms of the agreement. *L & E Corp. v. Days Inns of America, Inc.*, 992 F.2d 55, 58 (4th Cir. 1993); *Portsmouth Redevelopment v. BMI Apts. Assoc.*, 851 F.Supp. 775, 783 (E.D.Va. 1994); *Wellmore Coal Corp. v. Patrick Petroleum Corp.*, 808 F.Supp. 529, 534 (W.D.Va. 1992). Each of these fundamental doctrines now require further explication in an effort to resolve the tension between them.

### The Common Law Principle Of Materiality

■ As the Supreme Court of Virginia held in *Neely v. White:*

> The *controlling legal principle* is clearly and succinctly stated in 12 Am.Jur., s 360, as follows: 'It does not follow in every case of mutual and dependent promises that upon a failure of one party to perform his promise the other party will be exonerated

---

7. Virginia Power raised for the first time in its Proposed Findings of Fact and Conclusions of Law that RW Power also neglected to conduct relay tests and operational checks as required by Paragraph VII of Exhibit B to the Agreement. The parties agreed that this is a matter not properly before the court and, as such, it is not being considered in this opinion.

8. The parties agree that, RW Power's claim for breach of the duty of good faith and fair dealing should be dismissed for failure to state a claim upon which relief can be granted because there is under Virginia law no claim for breach of that

duty either in contract or tort. However, RW Power asserts that the implied duty of good faith itself exists in every contract under Virginia law and that breach of it estops Virginia Power's termination.

9. *See also Sternheimer v. Sternheimer*, 208 Va. 89, 97, 155 S.E.2d 41, 47 (1967) ("rescission and cancellation of a contract will not be given because of a partial failure of consideration, ... Nonperformance must be total or substantial ..."), citing 16 *Mich.Jur.* Rescission, Cancellation and Reformation, § 15 at p. 147.

or excused from performing his promise. *Before partial failure of performance of one party will excuse the other from performing his contract or give him a right of rescission, the act failed to be performed must go to the root of the contract. A failure of consideration of such a degree that the remaining consideration may be deemed to be no substantial consideration is an excuse for nonperformance of a promise....* But a failure of an unsubstantial part of the consideration for a contract is not such an excuse. *Such failure of the consideration is merely a ground for an abatement of the damages.* Neely v. White, 14 S.E.2d at 340–41; *see also Matzelle v. Pratt,* 332 F.Supp. 1010, 1012 (E.D.Va.1971) ("Rescission should be permitted only when the complaining party has suffered a breach so material and substantial in nature that it affects the very essence of the contract and serves to defeat the object of the parties.").

The common law embodies the corollary doctrine that a party may cure even a material breach.

> Although a material breach justifies the injured party in suspending performance, it does not of itself justify the injured party in terminating the contract. Fairness ordinarily dictates that the party in breach be allowed a period of time—even if only a short one—to cure the breach if it can.

*Farnsworth on Contracts,* Total Breach and Termination, § 8.18; Restatement (Second) of Contracts § 237 (1981); *Citizens Home Insurance Company, Inc. v. Glisson,* 191 Va. 582, 589, 61 S.E.2d 859, 861 (1950).[10]

█ Finally, there is the integrally related rule of contracts that the law abhors a forfeiture and that "contractual provisions for forfeiture are looked upon with disfavor by the courts ..." *Galvin v. Southern Hotel Corp.,* 154 F.2d 970, 973 (4th Cir.1946); *In re University Cafeteria, Inc.,* 47 B.R. 404, 406

(W.D.Va.1985). This rule is complementary to the common law principles of materiality and cure. Restatement (Second) of Contracts § 237 (1981).

█ As *Neely v. White* makes clear, a material breach is one that goes "to the root of the contract." In other words, a material breach "deprive[s] the injured party of the benefit that the party justifiably expected from the exchange." *Farnsworth on Contracts,* Material Breach and Suspension, § 8.16. Conversely, a breach that does not undermine the fundamental expectations of the parties cannot be the basis for cancellation. Accordingly, "[i]f one party to a bilateral contract commits a partial breach of his duty, one that is not so material as to discharge the other party's duty of performance, the latter's only remedy is damages for the partial breach." 6 *Corbin on Contracts,* Nonperformance of Condition, § 1253. As Farnsworth explains:

> "[i]t is in society's interest to accord each party to a contract reasonable security for the protection of that party's justified expectations. But it is not in society's interest to permit a party to abuse this protection by using an insignificant breach as a pretext for avoiding its contractual obligations."

*Farnsworth on Contracts,* Power to Suspend Performance and Terminate the Contract, § 8.15.

█ The Restatement (Second) of Contracts § 241 points to five factors which are useful in identifying the materiality of a breach:

(1) the extent to which the injured party will be deprived of the benefit which he reasonably expected;

(2) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;

---

10. The parties assert, with varying degrees of conviction, that the Uniform Commercial Code is not applicable here. It is not necessary to confront that question. Nonetheless, it is useful to recall that the UCC also recognizes the common law principle of cure in several instances. *See,*

*e.g.,* Va.Code Ann. § 8.2–508 (seller has the opportunity to cure improper tender or delivery); 2A Va.Code Ann. § 8.2–612 (allowing seller opportunity to cure nonconformity in an installment contract before buyer may properly reject the goods).

(3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(4) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking account of all the circumstances including any reasonable assurances;

(5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

Assessment of those factors demonstrates that the breach here is not a material one.

## 1. *Deprivation Of Reasonably Expected Benefit*

The principal benefits of the Agreement to Virginia Power were access to the Facility's capacity and the right to purchase the electricity generated by the Facility. Virginia Power does not allege that RW Power failed to provide standby electrical output capacity or to sell electricity upon request. Nor does Virginia Power contend that RW Power failed to pay any sums it owed Virginia Power under the Agreement.

Of course, Virginia Power also was entitled under paragraph SIXTH to security for RW Power's "performance under this Agreement" which is further defined in the same sentence in the following terms: "to ensure continued availability of the Facility and to guarantee payment of obligations by [RW Power] to Virginia Power." The undisputed record is that the breach never deprived Virginia Power of either of these benefits conferred on Virginia Power by paragraph SIXTH.[11]

## 2. *Adequate Compensation For Deprivation*

There seems to be little doubt that an award of damages would have provided adequate compensation for the breach if it had caused damage. However, Virginia Power suffered no damage as a consequence of the breach. Therefore, this factor plays no role in the materiality analysis in this action.

## 3. *Forfeiture Suffered By The Breaching Party*

■ Termination of the Agreement results in forfeiture by RW Power of all benefits inuring to its benefit under the remaining 27 years of a 29 year contract which dedicates the capacity of the Facility to Virginia Power and generates a continual and substantial revenue stream. In addition, termination would entitle Virginia Power to a refund of approximately $1.8 million in prepaid capacity payments. Finally, RW Power asserts that cancellation of this contract would place in jeopardy its $3.2 million investment in constructing the Facility because the anticipated long term revenue stream formed the basis for the financing of the Facility. Where, as here, Virginia Power has suffered no loss or damage as a consequence of the breach, the loss of the contract by RW Power clearly is a forfeiture.[12]

## 4. *The Cure Factor*

RW Power has provided a replacement letter of credit. Although it was issued on July 6, 1995, the replacement did not conform to Virginia Power's requirement that the letter be drawable on a Richmond bank. NatWest immediately amended the letter on July 7, 1995 to meet this requirement. Virginia Power received the amendment and RW Power asserts its cure was completed on July

---

**11.** The Facility was at all times operational and the only obligation owed by RW Power under the Agreement was a minuscule sum for the purchase of electricity to run the plant (estimated at $225) as to which Virginia Power was entitled to an offset against its pending obligations to pay for previously purchased power.

**12.** RW Power also contends that the extent of the forfeiture includes losses to its investors and the impairment of its general partner to raise capital. RW Power, however, cites no authority which

would warrant consideration of factors such as this in assessing the extent of forfeiture in the materiality analysis suggested by Restatement (Second) of Contracts § 241. Nor does logic support assessment of the possible loss to investors of a contracting party or the consequences to a related entity. Both, of course, are highly speculative and, in any event, are so remote from the contract that it is not appropriate to consider them in the materiality calculus required by the Restatement.

10, 1995. Virginia Power, however, half-heartedly asserts that the letter of credit is still defective because it is in two parts: the original letter and the amendment. However, Virginia Power cites no authority to support this notion and there is no evidence which would permit a finding that Virginia Power cannot draw on the replacement as amended by NatWest.

### 5. The Breaching Party's Failure To Conform To Standards of Good Faith and Fair Dealing

■ The conduct of RW Power clearly evinces serious inattention to the obligation imposed on it by paragraph SIXTH. However, it cannot be said that RW Power's breach of that paragraph fails to comport with standards of good faith or fair dealing.[13] "Good faith performance or enforcement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party ..." Restatement (Second) of Contracts § 205 cmt. (1981); see also Va.Code Ann. § 8.2–103 (" 'Good faith' ... means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade"). See generally U.C.C. § 1–203 (Official Comment). RW Power's attempt to conceal its own laggardness did nothing to jeopardize Virginia Power's right to enjoy the fruits of the contract. It was an attempt to mask its own behavior that could have resulted in a longer period during which Virginia Power stood unsecured; but its actions were not designed to be nor were they in fact detrimental to Virginia Power. A breach of the duty of good faith and fair dealing requires more than mere inattention to good business practice and that is what RW Power's conduct here amounts to.

The factors articulated by Restatement (Second) of Contracts § 241 find support in Virginia decisional law. For example, the doctrine of materiality enunciated in Neely v. White, is based on the same considerations as appear in factors (1) and (2) of the Restatement. Thus, they form the "controlling

legal principle" in assessing materiality under Virginia law. Neely v. White, 14 S.E.2d at 340–41. And, as explained above, cure, avoidance of forfeiture and good faith and fair dealing all represent basic tenets of Virginia's contract law. Thus, Virginia's substantive law is fully consistent with the materiality analysis prescribed by the Restatement.

Application of these basic principles in this action leads to the inevitable conclusion that the failure to have in place a letter of credit for a period of at most 10 days, during which time no injury befell Virginia Power, was not a material breach of contract. Consequently, Virginia Power was not entitled to terminate the Agreement. It would be entitled to damages for partial breach, but it has shown none.

### Abrogation Of Common Law Materiality By Agreement

Virginia Power seeks to avoid that result by arguing that these fundamental precepts of Virginia law do not apply in this action because of the application of the equally basic principle that parties may displace the common law by agreement. Here, the parties agreed in Article XI that: "If Operator fails to perform any of its obligations pursuant to this Agreement, then Virginia Power may cancel this Agreement." And, according to Virginia Power, it is also a fundamental rule of Virginia contract law that "where a contract gives one party the right to cancel the contract upon any breach by the other party, the contract properly can be canceled upon any breach irrespective of its materiality." (Virginia Power Proposed Findings of Fact and Conclusions of Law, p. 17, ¶ 60) (emphasis added).

Virginia Power cites several decisions which at first blush appear to support this position. Safeway, Inc. v. The Plaza Company of Virginia, 248 Va. 1, 444 S.E.2d 544 (1994); Eagler v. Little, 217 Va. 869, 234 S.E.2d 242 (1977); Clevert v. Soden, 241 Va. 108, 400 S.E.2d 181 (1991); Reston Recre-

---

**13.** Although Pettoni's alteration of the document could be considered as evidence of bad faith and unfair dealing, that conduct, which is an inexcusable lapse of business ethics at the least, was not directed toward Virginia Power. Hence, it does not militate against RW Power in the analysis of this factor.

*ation Ctr. Assocs. v. Reston Property Investors, L.P.*, 238 Va. 419, 384 S.E.2d 607 (1989). In each of those decisions, however, the termination provision either encompassed very clearly the particular default giving rise to the termination, or it involved a rather cursory termination provision, such as the present one, and a breach which the court considered to be material.

For example, in *Safeway, Inc. v. The Plaza Company of Virginia*, 248 Va. 1, 3, 444 S.E.2d 544, 544–45 (1994), the contract provided that "if said sizes or arrangements [of common areas] are changed without lessee's written consent, lessee may cancel this lease by notice to lessor." Unlike Article XI of the Agreement, the provision in *Safeway* explicitly defined the breach which permitted termination, thereby making it material as a matter of contract.

In *Eagler v. Little*, 217 Va. 869, 870, 234 S.E.2d 242, 243 (1977), the contract specified that "[i]f the Lessees ... shall neglect or fail to perform and observe any covenant or condition ... the lessor may immediately ... repossess" the premises and terminate the lease. Although the termination provision in *Eagler* was indefinite, much like the one in this action, the breach which precipitated the termination was unquestionably material. The tenant failed to pay taxes for a full two years, notwithstanding frequent demands by the landlord. Moreover, the Supreme Court of Virginia described the clause creating the right of termination as one by which the parties created "an estate [reverter of possession for non-payment of taxes] upon a condition subsequent" and described the breaches as going to a "substantial right in the landlord" because the breaches created liens upon the landlord's title. Thus, to the extent that *Eagler v. Little* applies here at all, it must be counted as permitting termination for a material breach accompanied by contract language not unlike that in Article XI.

In *Clevert v. Soden*, 241 Va. 108, 109, 400 S.E.2d 181, 182 (1991), the Supreme Court of Virginia construed a clause which provided that "[i]f either party defaults in the performance of this contract, such defaulting party shall be liable" for the real estate agent's commission. However, the breach, $17,868 in defective workmanship and material, was in the words of the court, "'fairly grievous' and a material breach of the contract." *Id.*, 400 S.E.2d at 183.

Similarly, in *Reston Recreation Ctr. Assocs. v. Reston Property Investors, L.P.*, 238 Va. 419, 384 S.E.2d 607 (1989), the contract provided that: "if default shall be made by Tenant in the performance of or compliance with any of the covenants, agreements, terms or conditions contained in this Lease" the landlord may terminate the lease. This provision is similar to Article XI; however, the breach giving rise to termination, a failure to maintain liability insurance on a hazardous business, was certainly material. Indeed, the Supreme Court of Virginia held that the failure of the tenant to maintain liability insurance jeopardized the landlord's interests in future rental payments. In essence, this is a determination that the breach was material because the landlord's principal benefit under any lease is the right to receive rent.

Therefore, viewed in perspective of the facts, the statement in *Reston* that "[i]f the tenant failed to cure the default after notice thereof, the provisions of paragraph 28 of the lease gave the landlord the right to terminate the tenancy, regardless of the materiality of the breach." is *dicta* as respects termination for a non-material breach when the contract does not provide an opportunity for cure. *Id.*, 384 S.E.2d at 610 (citations omitted). Moreover, because the contract in *Reston* contained a cure provision, the statement respecting materiality and termination controls only if the contract has a cure provision which the present Agreement does not. This reading of *Reston* is confirmed by examination of the four authorities which follow the statement in *Reston* which is the linchpin of Virginia Power's argument: that cancellation is proper upon breach of an agreement, "regardless of the materiality of the breach."

First, in *Home Creek Smokeless Coal Co. v. Combs*, 204 Va. 561, 132 S.E.2d 399 (1963), the Supreme Court of Virginia refused to declare a forfeiture for default in the payment of royalties under coal mining leases and for delays in mining where there was no express provision for forfeiture in the leases

themselves. The Court explained, "[t]here was no provision for forfeiture in either lease, and, generally, unless there is such *express provision*, the breach of a covenant of the lease does not work a forfeiture." *Id.*, 132 S.E.2d at 406 (emphasis added). In the present action, the only express "forfeiture" clause was paragraph EIGHTH, which did not envision forfeiture on failure to maintain a letter of credit.

Second, in *Olson v. Pedersen*, 194 Neb. 159, 164–65, 231 N.W.2d 310, 314 (1975), the Supreme Court of Nebraska held that "[n]onperformance of a covenant by one party to a lease, unless the performance is an *express condition*, does not excuse the other party from performing . . ." (emphasis added) The court continued to explain that:

> a tenancy cannot be terminated for the breach of a covenant, condition, or collateral agreement by the lessee unless there is *an express and distinct provision* in the lease for a forfeiture or right of reentry on the occurrence of the breach. Forfeiture of estates under leases are not favored in law and the right to forfeit must be *clearly stipulated*. If a forfeiture has not been stipulated for, a covenant or condition which is merely implied, or an express one not clearly within the forfeiture clause, will not sustain a claim of forfeiture for breach.

*Id.*, 231 N.W.2d at 314 (emphasis added). Against that background the court in *Olson* observed:

> the general principle of contract law that, where a breach is so material and substantial as to defeat the objects of the parties in making the contract, forfeiture or rescission may be declared. . . . In the absence of a forfeiture clause, breach of a covenant is ordinarily not ground for forfeiture of a lease because an action for damages is an adequate remedy.

*Id.* at 315.

The court determined that the lease was improperly canceled because, at the time the landlord notified the tenant of termination, no grounds for forfeiture or termination exited. Likewise, because the present Agreement contained no express clause permitting cancellation for the non-material breach of failing temporarily to maintain a letter of credit, this Agreement was improperly cancelled.

Third, *Associated Cotton Shops v. Evergreen Park Shopping Plaza*, 27 Ill.App.2d 467, 170 N.E.2d 35 (1960), involved a lease provision giving lessor the right upon 60 days' notice to terminate the lease if shares of the corporate lessee were sold so as to result in a change of control of the lessee. The court found the cancellation provision to be "*clear, definite and unambiguous,* and, applying the strictest canons of construction, it means exactly what it says." *Id.*, 170 N.E.2d at 38 (emphasis added). Because a change of control occurred, the lessor properly cancelled the lease. *Associated Cotton Shops* is akin to *Safeway* wherein the particular breach giving rise to cancellation was explicitly described in the contract.

Fourth, in *City of Douglas v. Douglas Canning Co.*, 17 Alaska 545, 161 F.Supp. 379 (1958), the court stated that:

> [c]ourts do not favor forfeitures and it is the general rule that provisions in leases permitting forfeitures are to be strictly construed against the lessor. . . . However, where the terms of the contract which affect the alleged breach are *clear*, and call for forfeiture, as in this case, then a forfeiture is unavoidable if the alleged breach does in fact exist.

*Id.* at 385 (emphasis added). In *Douglas Canning*, the breach, a failure to operate a salmon cannery as required by the lease and a removal of cannery machinery, undermined the very purpose of the lease. The court permitted forfeiture of the entire contract because the lessor could not have been justly compensated for the substantial and grievous breach. In addition, the lease contained an express cancellation provision if the premises ever ceased to be used as a cannery. Conversely, the Agreement here contained no express cancellation provision for a delay in securing a replacement letter of credit; the breach did not undermine the purpose of the contract; and Virginia Power could have been compensated adequately either by drawing down sums pursuant to the old letter of credit or by damages to compensate it for any injury as a result of the lapse.

For those reasons, the decisions on which Virginia Power relies and the decisions cited in *Reston* are not controlling here.

The Virginia decision closest on its facts to those presented by this action is *Galvin v. Southern Hotel Corp.*, 154 F.2d 970 (4th Cir. 1946), wherein a lessee fell in arrears for over $9,000 in rent and the district court held that the lessor properly cancelled because the terms of the contract allowing repossession for breach of *any* covenant of the lease required both prompt payment of rent *and* the maintenance of security in the full amount during the entire lease term.

On appeal, recognizing that the lessee was in default under a lease which contained a forfeiture provision for breach of any covenant, the Fourth Circuit held:

> every violation of a contract containing forfeiture provisions does not necessarily require an actual forfeiture of the defaulting party's rights, and we think that in the present case especially persuasive circumstances are found for the application of the settled principle of both law and equity that contractual provisions for forfeiture are looked upon with disfavor . . .

*Id.* at 973. The Court of Appeals concluded that the breach was non-material because the lessee had authorized the lessor to pay itself out of bonds worth $12,000 that the lessee had posted as security under the terms of the lease. In addition, the court was influenced by the fact that the lessor was, by virtue of the bonds, at all times completely protected with respect to every right it enjoyed under the lease. *Galvin*, however, was in large part a product of its unusual factual circum-

stances, and it does not have the effect of precedent here.[14]

Consequently, this action presents a question of first impression in which this court is required to determine how the Supreme Court of Virginia would resolve the tension between two well-entrenched doctrines of Virginia's contract law: the common law concept of material breach and the ability of parties through explicit contractual language to override such common law principles.[15] The analysis proceeds from the well-established premise so clearly stated in *Neely v. White*, the leading Virginia decision, and in the most respected treatises, that cancellation is permitted only for a material breach. The related doctrines of cure and forfeiture avoidance are but reflections of the very basic role which the principle of materiality plays in the law of contracts in Virginia and generally. The basic purpose of these correlative principles is to enforce the societal interest that the contracting parties be accorded security for their justified expectations and, at the same time, to preclude abuse of that protection by foreclosing contract cancellation on the basis of an insignificant breach. *Farnsworth on Contracts, Power to Suspend Performance and Terminate Contract*, § 8.15.

So firmly rooted are these concepts that, although the parties may displace them by agreement, the agreement to do so must clearly admit of but one interpretation: that a breach—whether material or otherwise—may be the basis for termination. In discussing when one party's breach excuses performance by the other, Williston has explained that "in the absence of a *clearly expressed* intention, the consequence that[,]

---

14. Non–Virginia cases have addressed the issue. For example, in *Mad River Lumber Sales, Inc. v. Willburn*, 205 Cal.App.2d 321, 22 Cal.Rptr. 918 (1962), the contract contained a termination clause for "breach of any of the terms, covenants, and conditions" in the agreement. The defaulting party was engaged in deficient logging practices and failed to improve its performance after repeated warnings. The non-breaching party cancelled the contract, but failed to give 15 days notice and an opportunity to cure as required by the contract. The court found this improper and added that if the deficiencies were not "so material as to discharge the contract," then it was also improper to terminate the con-

tract without permitting the defaulting party an opportunity to correct its breaches, notwithstanding the cancellation clause.

15. When a federal court is sitting in diversity, it must "apply the law of Virginia as articulated by the Supreme Court of Virginia," or as it "predict[s] would be applied by the Supreme Court of Virginia were the case before it." *Nature Conservancy v. Machipongo Club, Inc.*, 579 F.2d 873, 874–75 (4th Cir.), *cert. denied*, 439 U.S. 1047, 99 S.Ct. 724, 58 L.Ed.2d 706 (1978); *see also Dolwick v. Leech*, 800 F.Supp. 321, 324 (E.D.Va. 1992).

for even permanent default in prior performance of slight importance[,] subsequent performance should be wholly excused cannot be accepted." *Williston on Contracts,* Non–Performance as Excuse for Breach, § 829 (emphasis added). Or, as the Fourth Circuit framed it in *LeRoy Dyal Company, Inc. v. Allen,* 161 F.2d 152 (4th Cir.1947):

> if a contract calls for a number of performances on both sides, and there is no *clear intention* as to what shall happen if default is made in a prior performance of *slight importance,* it does not follow that subsequent performance by the other party is excused. The decision depends upon the importance and materiality of the prior default, and the materiality of the failure should be determined by ascertaining whether it would be more just to free the injured person or to require him to perform his promise giving him, in either event, a right of action for any damages he may have suffered.

*Id.* at 155 (emphasis added). Where the breach is not material and the contract does not explicitly state that an immaterial breach will excuse further performance, termination of the contract is improper, and the injured party is limited to damages for the breach. The Supreme Court of Virginia in *Home Creek Smokeless Coal Co. v. Combs,* 132 S.E.2d at 406, has underscored the principle that, unless there is a provision in a contract clearly and expressly allowing forfeiture, the breach of a covenant does not justify cancellation of the entire contract.

 Of course, where the contract language makes it clear that the parties have agreed that any breach, material or not, permits cancellation, the courts must give effect to that agreement. Such an agreement, however, may not be lightly inferred nor may the courts, by interpretation, supply that which has not been made explicit.

 Here the contract provides only that if RW Power "fails to perform any of its obligations pursuant to this Agreement, then Virginia Power may cancel this Agreement." Thus, the plain language of Article XI does not clearly state that any breach, material or otherwise, permits cancellation. If, as must be done, the contract is construed as a whole

so as to give effect to all of its provisions and in a way that avoids unreasonable results, *Management Sys. Assocs. v. McDonnell Douglas Corp.,* 762 F.2d 1161, 1172 (4th Cir. 1985); *Dart Drug v. Nicholakos,* 221 Va. 989, 993–94, 277 S.E.2d 155, 157–58 (1981), Article XI cannot be construed to permit cancellation for a non-material breach of any obligation.

In sum, the language of Article XI does not abrogate the common law principle of materiality because it does not state clearly that cancellation may be based on any breach, material or otherwise. Yet, that is what must be done if a contract is to abrogate a principle which is so fundamentally embedded in the common law. Otherwise, the courts are called upon to effect abrogation by interpretation.

Virginia Power urges that the phrase "fails to perform any of its obligations" in Article XI should be read to abrogate the materiality requirement. This, of course, means that the words "fails to perform" must be interpreted as being modified by the phrases "in any way" or "materially or non-materially" or by some other language which explicitly abrogates materiality. A court is not at liberty to read words of such import into the language chosen by the parties because, as shown above, to do so is to create an agreement abrogating the common law by judicial interpretation.

 In a related argument, Virginia Power asserts that, when Article XI is read in conjunction with paragraph EIGHTH, the clear meaning of Article XI is to permit cancellation without regard to materiality. Paragraph EIGHTH reads in part:

> Operator and Virginia Power agree that Operator's failure to comply with either (i), (ii), or (iii) below will be a material breach of this Agreement. Virginia Power may cancel this Agreement if Operator fails to (i) complete financial closing by September 1, 1992, (ii) commence construction of the Facility by February 1, 1993, or (iii) achieve Commercial Operations Date by July 1, 1993.

According to Virginia Power, the presence of a materiality prerequisite for cancellation

and the definition of what obligations were material in paragraph EIGHTH illustrates that the absence of such language in Article XI reflects a clear intent to abrogate materiality as to all breaches of all obligations. On the other hand, RW Power argues that paragraph EIGHTH renders Article XI ambiguous and that the ambiguity must be resolved against Virginia Power as the drafting party.[16]

Neither result obtains, however, if the Agreement is read as a whole and is interpreted to give a reasonable meaning to all of its provisions. *D.C. McClain, Inc. v. Arlington County,* 249 Va. 131, 135–36, 452 S.E.2d 659, 662–63 (1995). Paragraph EIGHTH addresses three specific breaches of pre-operational conditions identified by the parties as material and as warranting cancellation upon the occurrence of any one of them. Once the Facility was in commercial operation, paragraph EIGHTH is no longer a consideration and Article XI governs termination by Virginia Power in the event of RW Power's breach of the Agreement for the remaining duration of its 29 year term. Read as a whole, the Agreement does not evince a clear intent to permit destruction of the contract as a result of slight imperfections in its performance.

Moreover, the arguments centered on the effect of paragraph EIGHTH serve to illustrate why the parties must expressly abrogate the common law in words that lead only to that result. This is because, if abrogation is achieved by adoption of either argument, it is the court, not the parties, which abrogates the principle of materiality. As explained above, that principle derives from an important societal interest and is firmly rooted in the law of contracts. It cannot, and should not, be rendered inoperative by anything less than clear terms so that all concerned realize that they are agreeing to alter the basic rules of contract.

It is unnecessary to determine the effect of Virginia Power's alleged breach of the implied duties of good faith and fair dealing because the court does not find that Virginia Power acted in bad faith in attempting to cancel the contract. It was simply

exercising what it believed to be rights reserved to it under the contract. Strict adherence to the rights conferred by contracts constitutes neither bad faith nor a failure to deal fairly. Moreover, as this opinion makes clear, the Virginia law in the subject was not settled and the interpretation of Article XI adopted by Virginia Power was a reasonable, albeit erroneous, one.

### CONCLUSION

Based on the foregoing, the court concludes that, because RW Power's failure to maintain a letter of credit was a non-material breach of contract and the Agreement failed to contain language specific enough to override the fundamental common law rule prohibiting cancellation in the absence of a material breach, Virginia Power improperly cancelled the Agreement.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record.

It is so ORDERED.

---

**16.** Ambiguities in contracts are construed against the drafting party under Virginia law, *Mahoney* *v. NationsBank of Virginia,* 249 Va. 216, 222, 455 S.E.2d 5, 9 (1995), and generally.