## CIRCUIT COURT OF LOUDOUN COUNTY

South Auburn, L.P.,
and Peak Investment, L.L.C.

v.

Old Auburn Mills, L.P.,
NL Holdings, Inc.,
and John J. Nicholas, Jr.

Case No. (Chancery) 24210

BY JUDGE THOMAS D. HORNE

June 13, 2005

This case is before the Court on the motion of the Complainants for preliminary injunctive relief. The parties were directed to file affidavits in support of their respective positions. Those affidavits and the accompanying papers have been reviewed. After hearing the arguments of counsel, the Court took the matter under advisement.

The merits of the instant motion are to be judged according to familiar principles established for deciding requests for preliminary injunctions. These include consideration of the balancing of the hardships, the likelihood of success on the merits, the likelihood of irreparable harm should relief not be afforded the requesting party, and the public interest. *See Blackwelder Furniture Co. v. Seilig Manufacturing Co.*, 550 F.2d 189 (4th Cir. 1977). In the instant case, the Court need go no further than a consideration of the harm to the Complainants should preliminary injunctive relief not be granted.

A merits hearing on the underlying Bill of Complaint is scheduled within the coming month. In order for any settlement agreement with the County to be effected, the Complainants must consent. It is impossible to either qualify or quantify the allegations of lost good will with the County upon the extant record. In short, the likelihood of irreparable harm to the Complainants, should injunctive relief not be granted, has not been shown.

August 18, 2005

Complainants, South Auburn, L.P., and Peak Investment, L.L.C., seek declaratory and injunctive relief in this contract dispute with the defendants, Old Auburn Mills, L.P., NL Holdings, Inc., and John J. Nicholas, Jr. Central to a determination of the controversy is whether the complainants wrongfully terminated the Zoning and Marketing Agreement dated August 10, 1998, (also identified in the contract documents as the Auburn Hills Joint Venture) that provided for Old Auburn Mills, acting through John J. Nicholas, Jr., its president, and NL Holdings, Inc., its general partner, to act as sole and exclusive marketing representative in connection with a joint zoning and marketing effort for properties owned by the parties or their predecessor in interest. The original agreement was the subject of several later amendments.

The complainants contend that the defendants breached the terms of the Zoning and Marketing Agreement and the amendments made thereto by the following:

(1) Failing to file a timely rezoning application;

(2) Failing to make documents available to them for their inspection;

(3) Failing to pay property taxes;

(4) Failing to diligently pursue rezoning litigation;

(5) Failing to pay the costs of rezoning litigation; and

(6) Failing to provide periodic reports.

It is the contention of the complainants that, as a result of such defalcations, they properly terminated the Zoning and Marketing Agreement on March 8, 2004, and that, despite such termination, the defendants, through Mr. Nicholas have continued to hold themselves as sole marketing representative. Accordingly, the complainants have requested a declaration of the rights of the parties with respect to the Agreement and its three amendments; injunctive relief to prohibit the defendants from asserting any rights under the agreement; and an award of counsel fees and costs.

A short chronology of the events giving rise to this action for rescission of the Zoning and Marketing Agreement is helpful to an understanding of the case. The following dates are noteworthy.

August 10, 1998: The parties sign The Zoning and Marketing Agreement. The agreement provides that a final application for rezoning and all supporting documents and fees are to be filed with the proper office by December 31, 1998.

May 26, 1999: Rezoning application, ZMAP 199-0007, accepted for action by the Board of Supervisors.

August 18, 1999: The First Amendment to the Zoning and Marketing Agreement is signed. The Final Application date for the rezoning is changed from December 31, 1998, to July 31, 1999. The term of the agreement is extended to December 31, 2005. Peak Investments L.L.C., is substituted for the Hutchisons in the Zoning and Marketing Agreement.

September 19, 2000: The Second Amendment to the Zoning and Marketing Agreement is signed. The amendment provides for the addition of the language "or other residential district of at least 1 unit per acre if so conferred by the Board of Supervisors of Loudoun County."

October 16, 2000: The Loudoun County Board of Supervisors rejects the rezoning application submitted, ZMAP 1999-0007.

November 15, 2000: Chancery No. 20417 filed appealing denial of the rezoning by the Board of Supervisors.

January 26, 2001: The Third Amendment to the Zoning and Marketing Agreement is signed, providing for apportionment of legal fees in connection with the appeal of the denial of ZMAP 199-0007.

October 17, 2001: Nonsuit Order entered in Chancery No. 20417.

April 8, 2002: Meredith Light writes to Nicholas, Peak, and Rumsey Light detailing the events of the Joint Venture up to that time, and he writes, "[k]eys to any improvement (of the joint venture) would include (1) better communication among the parties involved, (2) changes in the decision making process, and (3) changes in the division of sales proceeds provision to make it more equitable." Meredith Light represents that "each landowner will pay his own real estate taxes from now and Old Auburn would be relieved of that obligation." No response from Mr. Nicholas.

April 16, 2002: Transmittal of Bill of Complaint of nonsuited action challenging denial of rezoning ZMAP 199-007.

April 18, 2002: Meredith Light writes to Mr. Nicholas enclosing response form. No response from Mr. Nicholas.

June 7, 2002: Nicholas leaves voicemail response to April correspondence. He represents that a written response will be forthcoming to the April correspondence. No such response is given.

February 5, 2003: Downzoning suit, Chancery No. 22553, filed challenging action of the Board of Supervisors on January 6, 2003.

October 24, 2003: Letter from Nicholas to South Auburn and Peak enclosing draft contract from Winchester Homes.

March 8, 2004: Letter from South Auburn and Peak Investment to John Nicholas and Old Auburn Mills, Limited Partnership, terminating in writing the Zoning and Marketing Agreement.

Certain provisions of the Zoning and Marketing Agreement and the amendments are critical to a resolution of the instant controversy. The defendant, Old Auburn Mills, acting through the defendant Nicholas as its sole and exclusive representative, agreed to "file and diligently pursue a joint rezoning of the Old Auburn Property, South Auburn Property, and Hutchison (later Peak Investments, L.L.C.) Property to a PDH Zoning District of not less than 2 units per acre, nor more than 4 units per acre (later amended to provide "or other residential zoning district of at least 1 unit per acre if so conferred by the Board of Supervisors of Loudoun County"), exclusive of any non-residential uses as may be complementary to the project or required by Loudoun County Guidelines or Ordinances." These three properties are adjacent to one another and consist of 91.76 acres (Old Auburn), 391.37 acres (South Auburn), and 238.41 acres (Peak Investments) respectively.

The Agreement further provides that Old Auburn would pay all of the costs of the rezoning and that a final application for rezoning and all supporting documents and fees are to be filed with the proper office no later than December 31, 1998 (later extended to July 31, 1999, the term of the Joint Venture having been extended to December 31, 2005). Prior to submission, the final rezoning application for the properties is to be submitted to the parties for review and approval, although the parties are precluded from unreasonably withholding their approval. In the event Old Auburn is successful in its effort to rezone the properties, then it is obligated to pay all "rollback taxes" on the properties. In addition, Old Auburn obligated itself to escrow funds to pay the rollback taxes at the time of the final proffer signing prior to approval of a rezoning by the Board of Supervisors.

Compensation for Old Auburn is provided for at the time of the sale of the rezoned properties. The parties agreed that, at the time of sale and settlement of all or any portion of the combined property, any sale

proceeds would be distributed to the property owners as follows: the first $8,000.00 per acre (prorated for portions of acres) to the property owner who is the record owner of the parcel sold and any sales proceeds greater than $8,000.00 per acre would be paid 50% to Old Auburn; 31% to South Auburn; and 19% to Hutchison (Peak Investments, L.L.C.).

During the period of the agreement, Old Auburn agreed, in addition to paying the costs of rezoning and "roll back taxes" on the properties at the time of final proffer approval by the Board of Supervisors, to do the following:

(1) Pay the real estate taxes on the properties when billed by Loudoun County, provided the property owners take steps necessary to ensure the properties continue in land use for assessment purposes;

(2) Develop a market strategy and prepare an overall marketing program for the properties within four months of final approval of the rezoning;

(3) Make available copies of all correspondence, reports, filings, and other documents regarding the property for inspection and copying at the office of the project engineers;

(4) Provide, through Mr. Nicholas, all parties with quarterly, summary, progress reports in writing (by first amendment provided to read, "Quarterly reports by managing Joint Venture Partner, NL Holdings, Inc., John J. Nicholas, Jr., President, may be given orally as well as written, as provided in the original agreement");

(5) Diligently pursue its obligations and employ such individuals or firms it deems necessary to carry out its obligations, at its own expense;

(6) Carry comprehensive public liability insurance for the property owned by Old Auburn (Old Auburn is named as an additional insured on the policies of the other properties);

(7) Execute, along with the other owners, all necessary and pre-approved rezoning applications and documents requested or required by Loudoun County in connection with the rezoning applications and unanimously approved sale documents for the joint sale of the property; and

(8) Pay 50% of the legal and other court costs necessary to pursue an appeal of the denial of the rezoning of the property by the Board of Supervisors and all such legal and other costs in excess of $100,000.00 expended in such suit (Peak Investments to pay $19,000.00 and South Auburn, L.P., to pay $31,000.00).

The agreement specifically provides that:

150

Should Old Auburn default in any of its obligations hereunder, including but not limited to meeting all deadlines herein and securing approval of all parties to any rezoning application, marketing strategy and contracts, failure to escrow for roll-back taxes or failure to timely pay all taxes due on the properties, then any other party hereto may declare this Agreement to be null and void, in which event all parties shall be released from the terms hereof with the exception of Old Auburn's financial obligation assumed hereunder through the date of the termination and the guarantee thereof by NL Holdings, Inc. In addition, Old Auburn shall be liable to all other parties for any damages they may have incurred plus reasonable legal fees and costs.

On October 16, 2000, the Loudoun County Board of Supervisors rejected the rezoning application submitted by Auburn Hills, ZMAP 1999-0007, an action that was, as previously noted, the subject of an appeal. The action appealing the denial was subsequently nonsuited and later refiled.

The instant case was previously before the Court for temporary injunctive relief which was denied.

Whether the complainants are entitled to rescission of the Zoning Marketing Agreement is dependent upon whether the breach, if any, by the defendant was material or whether the parties, by the terms of their agreement, expressly provided for rescission in the event of such breach. The instant contract provides that the complainants may have the Agreement declared null and void in the event Old Auburn is in default of "any of its obligations." The phrase, "but not limited to," merely directs the reader to an illustrative list of contractual obligations assumed by the defendant.

While the defendants seek to raise defenses of waiver or estoppel, they do not find support in the instant record. As noted, all that can be gleaned from the evidence is that the complainants remained silent during the period the defendant was to report and pay the taxes on their behalf and that the defendants remained unwavering in their approach to the issue of the rezoning. Assuming, without deciding, that the complainants waived their right to demand payment of the real estate taxes after 2002, any such failure on the part of the complainants was not material to the contract. Moreover, the failure to pay taxes was not a material breach. The central purpose of the instant contract was not property management, the

payment of taxes, or the allocation of legal expenses. Accordingly, any such failure to pay would not constitute a material breach and can, like the issue of fees and costs, be the subject of an accounting when either the properties are sold or by an action for damages.

To the extent that the complainants failed to pay their share of the legal expenses called for in the third amendment, such failure does not go to the root of the contract, was collateral to the contract, and is not material. Thus, the application of the rule of first breach would not apply to limit their ability to later rescind the contract. *Federal Ins. Co. v. Starr Electric Co.*, 242 Va. 459, 468 (1991). Defendants may recover any counsel fees not paid in a suit for damages.

Absent an expression of a contrary intent by the parties, rescission is only available in the event a party is found in breach of a provision of a contract that is of such a substantial character as to "defeat the object of the parties in making the contract." *Neale v. Jones*, 232 Va. 203 (1986). In the instant case, it has not been shown that any of the breaches claimed and proven undermined the purpose of the Zoning Marketing Agreement, that is, to obtain a rezoning of the properties, develop a marketing strategy, and sell the properties at the minimum price agreed upon. As noted earlier, the expiration date of the agreement has been agreed upon as December 31, 2005, with time being of the essence.

Complainants' suggestion as to the materiality of the defendant's breach fails when measured by the five-factor analysis set forth in the *Restatement (Second) of Contracts* § 241. As noted by the Court in *RW Power Partners v. Virginia Electric & Power Co.*, 899 F. Supp. 1490, 1496-97 (E.D. Va. 1955):

> [t]he *Restatement (Second) of Contracts* § 241 points to five factors which are useful in identifying the materiality of a breach:
>
> (1) the extent to which the injured party will be deprived of the benefit which he reasonably expected;
>
> (2) the extent to which the injured party can be adequately compensated for the part of that benefit of which he will be deprived;
>
> (3) the extent to which the party failing to perform or to offer to perform will suffer forfeiture;

(4) the likelihood that the party failing to perform or to offer to perform will cure his failure, taking into account all of the circumstances including any reasonable assurances;

(5) the extent to which the behavior of the party failing to perform or to offer to perform comports with standards of good faith and fair dealing.

These factors will be discussed within the context of the evidence presented.

By their agreement, the parties expressed their mutual consent to a strategy for the rezoning, marketing, and sale of their combined properties. The agreement will not expire until the end of this year. The defendants have taken steps and developed a reasonable strategy to accomplish those goals including the filing of an application for a rezoning, appeal of the denial of the rezoning, a challenge to the downzoning of the parcel, and the transmittal of proposals. They mutually agreed upon an approach that included litigation, as well as legislative action, as evidenced by their cost-sharing agreement.

It is a basic tenet of the decision making process that the decision maker be kept reasonably informed of factors that may influence that decision. This is particularly true of development-based expectations that are dependent upon a consideration of such factors as cost, fees, taxes, market conditions, litigation prospects, and the political climate. Context is an important concept in decision-making. It was the intent of the agreement that the complainants would exercise oversight in the development process and not be casual bystanders. A decision by the complainants to withhold approval of the defendant's actions is contractually controlled by the rule of reason. However, the materiality of when and what information is furnished must be weighed within the context of the overall purpose and development-based expectation expressed in the agreement.

Indicative of the failure of the defendants, or those acting on their behalf, to keep the complainants informed are the circumstances leading to the issuance of a rule at the behest of counsel for the Board of Supervisors in the initial zoning appeal that was nonsuited. Such failure undermined the confidence of the complainants in the actions of the defendants and required them to seek outside counsel. This lack of communication is indicative of the absence of regular reporting mandated by the agreement. However, their failure did not undermine a process set

in motion by the parties that was envisioned to last until December of this year.

As noted, adequate compensation for any financial loss to the complainants or to the defendants as a result of a breach arising out of a non-payment of taxes, fees, or costs can be reasonably determined and cured by a damage award. It is clear from the correspondence that the complainants became disenchanted with the term of the agreement when viewed in the context of passive appreciation of the properties due to market conditions. However, unhappiness with the terms of the agreement does not justify the court in rescinding a contract for reasons not material to the contract.

Unquestionably, the defendants will suffer forfeiture should the Court find such breach to have been material to the contract, and there is a strong presumption against such forfeiture. *Id.* at 1496. They have expended considerable time and monies in support of the agreement. Moreover, the complainants may, with reason, decline to accept a proposal. The breaches complained of are not material and do not go to the very root of the contract. One party may not now rewrite the agreement to lessen the effect of such forfeiture.

Recognizing that there exists no independent action for a breach of good faith and fair dealing, complainant has withdrawn that portion of the Bill that would provide for such relief. However, as a factor to consider when weighing the materiality of the breach, counsel have argued this point. As noted in *RW Partners*, at 1498, "[g]ood faith performance or enforcement of an agreement of a contract emphasizes faithfulness to an agreed common purpose and consistency with the justified expectations of the other party . . . ('[g]ood faith . . . means honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade')."

The complainants failed to keep the defendants informed even after having the condition for reporting modified to permit oral reports and after having the failure to do so brought to the attention of Mr. Nicholas and an opportunity given to cure. However, the defendants have advanced funds to continue the litigation process and relayed offers to the complainants. Defendants actively sought approval from the Board of Supervisors, explored alternative development opportunities, and expressed a willingness to meet their other financial obligations.

Finding no material breach by reason of the failure to report, it is necessary that the complainants demonstrate the exception to the rule requiring a material breach going to the very root of the contract, that is,

whether the provision in the contract, "explicitly defined the breach which permitted termination, thereby making it material as a matter of contract." *RW Power Partners, L.P. v. Virginia Electric & Power Co.*, 899 F. Supp. 1490, 1499 (E.D. Va. 1995).

The provision of the contract that would permit a cancellation and rescission of the contract, ("declare the agreement to be null and void") by the complainants upon a default of Old Auburn "for any reason," does not specify that any such breach may be material or otherwise. It is strikingly similar to the provision of the contract in *RW Power*, in which case the complainant sought cancellation based upon a general provision permitting rescission upon a failure of the defendant to perform any of its obligations under the agreement. The addition of examples in the instant case is merely illustrative of some, but not all, of the instances that would, along with others, comprise a universe of defaults and did not explicitly define the breach that permitted termination, thus making the breach material.

In order to raise, any one or more of such defaults to a status that would abrogate the materiality requirement, the agreement must clearly state that any such breach may serve to cancel the agreement, whether material or not. The Court is persuaded that the contract, "[w]hen read as a whole . . . does not evince a clear intent to permit destruction of the contract as a result of slight imperfections in its performance." *Id.* at 1503.

Had the parties intended any default on the part of Old Auburn to be material, they were required to so state. The Court cannot read into the agreement a statement that the complainants might rescind the contract, with the attendant consequences to the defendants, for even the slightest breach on the part of the defendants. The breach must be material.

The parties to the agreement set out to rezone their properties in such a way as to meet their expectations for the development potential of the properties. A zoning application was filed and litigation pursued. During the period following the denial of the rezoning, the inaction attendant to the impact of litigation on the process was something neither the filing of documents nor periodic reporting would have advanced. While in retrospect, the complainants may have second thoughts about having embarked on such a course, it is one that was recognized and supported by an extension of the deadline and provision for funding. The method for paying taxes may have changed, but any adjustment to such payment is readily rectified by an accounting or an action for damages. By comparison, compensation for the efforts of the defendants is something difficult to determine and central to the dispute between the parties. In

balance, the consequence of forfeiture far surpasses any attendant harm the complainants may have suffered by reason of any default of the defendants or delay occasioned by the approach taken to further the purpose of the agreement.

Having failed to prove a material breach of the contract, the relief sought by the complainants will be denied and the Bill dismissed.